LEWIS REALTY, INC., and others, Plaintiffs, v. WISCONSIN REAL ESTATE BROKERS' BOARD, Defendant. [Appeal and cross appeal.]

*December 4, 1958—January 2, 1959.*

For the plaintiffs there were briefs by *Wood, Brady, Tyrrell & Bruce* of Milwaukee, and oral argument by *Jackson M. Bruce.*

For the defendant there was a brief by the *Attorney General* and *Robert J. Vergeront,* assistant attorney general, and oral argument by *Mr. Vergeront.*

CURRIE, J.   The following issues are raised on this appeal:

(1) Are certain of the board's findings of fact "unsupported by substantial evidence in view of the entire record as submitted" within the meaning of sec. 227.20 (1) (d), Stats.?

(2) Are certain of the board's conclusions of law without support in the board's findings of fact?

(3) Are the penalties imposed by the board's order so harsh or discriminatory as to make such order in whole or in part "arbitrary or capricious" within the meaning of sec. 227.20 (1) (e), Stats.?

(4) How are the words "incompetency" and "improper dealing" appearing in pars. (i) and (k) of sec. 136.08 (2), Stats., to be interpreted?

We consider that perhaps the best way of passing upon the first two of the foregoing enumerated issues would be to consider separately the board's findings and conclusions as they relate to the four transactions set forth in the board's notice of hearing, viz., the Ewens, Noetzel, Cychosz, and Kremer transactions. However, as the issue of statutory interpretation is pertinent to several of these transactions, we will dispose of such issue first.

Statutory Interpretation.

Sec. 136.08 (2), Stats., provides as follows:

"The board may also on its own motion, or upon complaint in writing, duly signed and verified by the complain-

ant, and upon not less than ten days' notice to the broker or salesman, suspend any broker's or salesman's license if it has reason to believe, and may revoke such license as provided hereafter, if it finds that the holder of such license has:

"(a) Made a material misstatement in the application for such license;

"(b) Made any substantial misrepresentation with reference to a transaction injurious to a seller or purchaser wherein he acts as agent;

"(c) Made any false promises of a character such as to influence, persuade, or induce the seller or purchaser to his injury or damage;

"(d) Pursued a continued and flagrant course of misrepresentation or made false promises through agents or salesmen or advertising;

"(e) Acted for more than one party in a transaction without the knowledge of all parties for whom he acts;

"(f) Accepted a commission or valuable consideration as a salesman for the performance of any act specified in this chapter from any person except his employer;

"(g) Represented or attempted to represent a broker other than the employer, without the express knowledge and consent of the employer;

"(h) Failed, within a reasonable time, to account for or remit any moneys coming into his possession which belong to another person;

"(i) Demonstrated untrustworthiness or incompetency to act as a broker or salesman in such manner as to safeguard the interests of the public;

"(j) Paid or offered to pay a commission or valuable consideration to any person for acts or services in violation of this chapter;

"(k) Been guilty of any other conduct, whether of the same or a different character from that specified herein, which constitutes improper, fraudulent, or dishonest dealing; or

"(l) Violated any provision of this chapter."

The terms of the above statute whose interpretation is at issue on this appeal are *"incompetency"* appearing in par. (i) and *"improper . . . dealing"* found in par. (k).

The plaintiffs assert that their competency to act as real-estate brokers or salesmen was established to the satisfaction of the board in the first instance under sec. 136.02, Stats., when the board licensed them. Such statute provides, ". . . Licenses shall be granted only to persons who are trustworthy and competent to transact such businesses in such manner as to safeguard the interests of the public, and only after satisfactory proof thereof has been presented to the board. . . ." From this premise the plaintiffs contend that such competency must be deemed to continue until impaired by future physical or mental injuries or illnesses, and that the word *"incompetency"* in sec. 136.08 (2) (i) should be interpreted to only embrace such impairment of mental or physical capabilities of a licensee as occurs subsequent to the issuance of the license by the board.

In the recent case of *Sailer v. Wisconsin R. E. Brokers' Board* (1958), 5 Wis. (2d) 344, 92 N. W. (2d) 841, we upheld a determination by the board that a failure of a real-estate broker to reduce a prospective purchaser's offer to writing and to have the same subscribed by such prospective purchaser, and to leave a copy with him, constituted "incompetency" on the part of the broker within the meaning of sec. 136.08 (2) (i), Stats. The opinion stressed the fact that the board had adopted a rule, 5 Wis. Adm. Code, sec. REB, 5.02 (2), which requires that a copy of any offer to purchase must be left by the broker or salesman with the person submitting the offer. We deem that such interpretation of "incompetency" in the *Sailer Case* controls the instant appeal.

The plaintiffs further contend that the term *"improper . . . dealing"* found in sec. 136.08 (2) (k), Stats., is too indefinite in meaning to afford any guide of conduct to licensed real-estate brokers and salesmen and is therefore unconstitutional and void. It is argued that it would be a violation of due process to revoke or suspend a license for

alleged violation of such an indefinite statutory standard. In support of such contention plaintiffs' brief quotes the following extract from Mr. Justice FRANKFURTER's concurring opinion in *Joseph Burstyn, Inc., v. Wilson* (1952), 343 U. S. 495, 532, 72 Sup. Ct. 777, 96 L. Ed. 1098:

"Prohibition through words that fail to convey what is permitted and what is prohibited for want of appropriate objective standards, offends due process in two ways. First, it does not sufficiently apprise those bent on obedience of law of what may reasonably be foreseen to be found illicit by the law-enforcing authority, whether court or jury or administrative agency. Secondly, where licensing is rested, in the first instance, in an administrative agency, the available judicial review is in effect rendered inoperative. On the basis of such a portmanteau word as 'sacrilegious,' the judiciary has no standards with which to judge the validity of administrative action which necessarily involves, at least in large measure, subjective determinations. Thus, the administrative first step becomes the last step."

That the word *"improper"* also "has no standards" has recently been determined by the supreme court of appeals of Virginia in *Booth v. Commonwealth* (1955), 197 Va. 177, 178, 88 S. E. (2d) 916, wherein that court quoted with approval the above language from Mr. Justice FRANKFURTER. The Virginia court held unconstitutional a statute which authorized courts to enter an order prohibiting the purchase of alcoholic beverages by a person convicted of drunken driving, or by one who "has shown himself to be an *improper* person to be allowed to purchase" such beverages. The opinion, in support of its holding that the word *"improper"* was too indefinite in meaning to provide a proper standard, quoted the following definition of such word appearing in Webster's New International Dictionary (2d ed. unabridged):

"Not proper; not suited to the circumstances, design or end; not appropriate, fit, or congruous; . . . not accordant with propriety or good taste or manner; . . ."

However, it is the duty of this court to so interpret a statute as to uphold its constitutionality if this can be reasonably done without doing violence to the accepted rules of statutory interpretation. We believe that the context in which the word *"improper"* is used in sec. 136.08 (2) (k), Stats., rules out such rather all-inclusive meanings as those set forth in the above-quoted dictionary definition. The material words of such statute are "other conduct . . . which constitutes improper, fraudulent, or dishonest dealing." The word "improper" has a more-comprehensive meaning than either "fraudulent" or "dishonest." Conduct which violates the moral code and takes an unfair financial advantage of another person with whom the actor deals, is a constituent part of both "fraudulent dealing" and "dishonest dealing." In order to save the constitutionality of the statute we consider it necessary that the words "improper dealing" as used in sec. 136.08 (2) (k) be restricted to conduct which involves moral culpability and which tends to take an unfair financial advantage of the person with whom the actor is dealing. In other words, it must be closely akin to dishonest or fraudulent dealing.

One of the recognized canons of statutory construction is that of *noscitur a sociis* whereby resort is had to associated words with which it is grouped to resolve the meaning of a word having a similar but more-comprehensive meaning than such associated words. 2 Sutherland, Statutory Construction (3d ed.), p. 393, sec. 4908. Under the rule of *noscitur a sociis* the meaning of a word takes color and expression from the purport of the entire phrase of which it is a part, and it must be construed so as to harmonize with the context as a whole. 50 Am. Jur., Statutes, p. 241, sec. 247; *Vilardo v. Sacramento County* (1942), 54 Cal. App. (2d) 413, 420, 129 Pac. (2d) 165, 168, 169.

Canons of statutory construction should never be employed where they defeat the obvious legislative intent.

*Boardman v. State* (1930), 203 Wis. 173, 176, 233 N. W. 556. The *Boardman Case* held that, in determining whether or not the legislature intended that an act should be construed in a certain way, consequences which follow from such a construction may be considered. One such consequence to be considered and avoided is the uncertainty that would follow from one construction, and not the other, thus requiring the court to hold the statute unconstitutional. *Orloff v. Los Angeles Turf Club* (1951), 36 Cal. (2d) 734, 741, 227 Pac. (2d) 449, 454.

## The Ewens Transaction.

On June 15, 1956, Mrs. Sylvia Ewens gave Lewis Realty, Inc.—West a listing for the sale of a duplex at a price of $14,900. The listing contract by its own terms expired August 1, 1956. On either Sunday, July 29, or Monday, July 30, 1956, a Mr. and Mrs. Humphrey gave Malawsky, a salesman for Lewis Realty, Inc.—West, a deposit of $595 and received from him an earnest-money receipt for such deposit. The receipt was dated July 30, 1956. Such receipt recited that the $595 was a part payment to apply on a purchase price of $14,900 for the Ewens duplex with the balance to be financed with monthly payments not to exceed $135, all subject to the written approval of the seller, Mrs. Ewens.

Malawsky testified that at the same time he had the Humphreys sign a printed blank mortgage-loan application to secure the financing. He obtained some personal data from the Humphreys and filled in part of this blank and the other parts were not filled in. This was because the data to be filled in later was dependent upon the appraisal which the building and loan association would later have made. Malawsky further testified that no purchase offer was signed that day by the Humphreys. He advanced two reasons for this. One was that the financing terms from the building and loan

association had not yet been obtained. The other was that certain furnishings owned by Mrs. Ewens were to be included in the purchase and the Humphreys wished to contact Mrs. Ewens so that such furnishings could be listed in the purchase offer. He stated that he requested the Humphreys to arrange to come into the Lewis Realty, Inc.—West office later in the week to sign the purchase offer and that they did so. He further testified that four copies were typed and the Humphreys were given one. The other copies of such signed purchase offer were then turned over to Zetley so that he might present the Humphreys' offer to Mrs. Ewens.

Mr. Humphrey did not testify but Mrs. Humphrey did. She testified that on July 29th Malawsky did have the Humphreys sign a blank purchase offer and that they did not receive a copy. As to the financing to be obtained, it was her desire to have a large first mortgage and a small second mortgage. She further testified that later that evening she phoned Malawsky and wished to withdraw from the deal and that he informed her it was too late. Malawsky, on the other hand, testified that such telephone conversation related solely to the items of furniture to be left in the property, and nothing was said about the purchase offer.

Zetley presented two written purchase offers to Mrs. Ewens. One was the Humphrey offer and the other from a Mr. and Mrs. Christensen. Apparently both provided for Mrs. Ewens taking back a second mortgage as part payment. The total purchase price under the Humphrey offer was $14,900, while that under the Christensen offer was $14,500, or $400 less. The Humphreys are colored and the Christensens white. Mrs. Ewens informed Zetley that because she had white tenants in the duplex she would not consider accepting the Humphrey offer. She also objected to the Christensen offer because it provided for her taking a second mortgage in part payment. Mrs. Ewens testified that Zetley pressured her into accepting the Christensen offer

over her objections. She stated that he said property could not be sold in the neighborhood in which the duplex was located without having to take back a second mortgage. She further testified that, when she threatened to employ another broker to sell the property, Zetley stated that the financing would still have to come through the Lewis company. Finally Mrs. Ewens accepted the Christensen offer by signing the acceptance thereof after first insisting that Zetley in ink change the terms of the $5,000 second mortgage from five to three years and the monthly payments to be made on it from $35 per month to $50 per month. Mrs. Ewens initialed such changes in the Christensen offer.

The testimony is in dispute as to whether this meeting between Zetley and Mrs. Ewens occurred on or about August 3d or August 8th or 9th, 1956. The next day after signing the acceptance of the Christensen offer Mrs. Ewens employed Attorney James Sammarco for the purpose of getting her released from the Christensen deal. Sammarco phoned Zetley and was told by the latter that there was no deal consummated. This was because the Christensens had refused to agree to the changes made in ink on their typewritten offer with respect to the terms of the second mortgage.

On August 10, 1956, Sammarco wrote Mrs. Ewens a letter in which he stated that he had succeeded in getting Zetley to release any claims for commissions that might be due on the listing agreement. The letter stated that Sammarco had also arranged for the "cancellation of the sales agreement so that you are now free to sell the property to any person you desire."

Apparently Mrs. Ewens was not satisfied with Sammarco's services and went to see the board about the matter. Mr. Tandberg, an attorney for the board, called on Zetley sometime later. Zetley was surprised at this because he assumed everything had been settled with Sammarco. Zetley then telephoned Sammarco about Tandberg's call and Sammarco

remarked that he thought everything was settled but stated, "Maybe you better send me a notice stating the listing is canceled." Zetley then wrote a further letter under date of August 30, 1956, to Sammarco in which he confirmed "our telephone conversation of a few days ago whereby Lewis Realty, Inc.—West cancels the listing contract" on the Ewens property.

The board's findings of fact made with respect to the Ewens transaction read as follows:

"That on June 15, 1956, the respondent, Lewis Realty, Inc.—West, entered into a listing contract with Sylvia Ewens, by which said respondent undertook to sell the Ewens' property at 2608 North 14 street, Milwaukee, Wisconsin, for a price of $14,900 cash;

"That on July 30, 1956, the property was viewed by Lucious and Viola B. Humphrey who made an offer of $14,900 to respondent Irving G. Malawsky, salesman for respondent, Lewis Realty, Inc.—West;

"That at the time of making the offer, said Humphreys signed a blank purchase offer, which was presented to them by respondent Malawsky;

"That the Humphreys never received a completed copy of this purchase offer;

"That on or about August 3, 1956, the said Sylvia Ewens was called to the office of respondent, Lewis Realty, Inc., to sign the acceptance of a purchase offer;

"That the respondent Zetley presented an offer from Arnold K. Christensen and Margaret A. Christensen in the amount of $14,500, which provided that Mrs. Ewens accept a second mortgage in the amount of $4,900, which Mrs. Ewens did not want to accept, since her listing called for cash;

"That respondent Zetley, by his aggressive manner and methods, induced said Mrs. Ewens to accept this offer, contrary to her own wishes;

"That shortly thereafter Mrs. Ewens requested that she be released from this offer, and that all of her papers be returned to her;

"That on or about August 10, 1956, the respondent Zetley finally agreed to release Mrs. Ewens from this purchase offer, and from her listing contract, but that she did not receive this release until after August 30, 1956;

"That in the Ewens transaction, respondent Marvin A. Zetley was acting in his capacity as vice-president, secretary, and manager of the respondent, Lewis Realty, Inc.—West."

The finding, that shortly after Mrs. Ewens signed the acceptance of the Christensen offer she requested that she be released and her papers returned, has no foundation in the evidence. She went directly to Sammarco without making any attempt to contact Zetley or Lewis Realty, Inc.—West.

The finding with respect to the release from the purchase offer and listing contract hardly qualifies as a fair statement of fact. There was no necessity for any release of the acceptance of the purchase offer because of the Christensen refusal to agree to the changes made in their offer. The listing contract had expired of its own terms on August 1, 1956, so no release was legally required of that to terminate it.

By stating the respective amounts of the Humphrey and Christensen offers in the findings, and omitting the undisputed fact that Mrs. Ewens of her own volition refused to consider the Humphrey offer because of the Humphreys being colored, an unfair implication is raised that Zetley urged Mrs. Ewens to accept the Christensen offer instead of the Humphrey offer to her own financial disadvantage.

The board's conclusions of law, based upon the findings of fact which relate to the Ewens transaction, read as follows:

"1. That the respondent Irving G. Malawsky, by his action in securing a blank purchase offer from Lucious and Viola B. Humphrey in the Ewens transaction, and in neglecting to furnish them with a copy of the completed purchase offer, and by his representations as found herein has demonstrated untrustworthiness and incompetency to act as a

salesman in such a manner as to safeguard the interests of the public, contrary to sec. 136.08 (2) (i), Stats., and has engaged in conduct which constitutes improper dealing, contrary to sec. 136.08 (2) (k), Stats.;

"2. That the respondent, Lewis Realty, Inc.—West, through the acts and representations of its agent Irving G. Malawsky, has demonstrated untrustworthiness and incompetency to act as a broker in such a manner as to safeguard the interests of the public, contrary to sec. 136.08 (2) (i), Stats., and has engaged in conduct which constitutes improper dealing, contrary to sec. 136.08 (2) (k), Stats.;

"3. That the respondent Marvin A. Zetley has engaged in conduct in the Ewens transaction which constitutes improper dealing, contrary to sec. 136.08 (2) (k), Stats.;

"4. That the respondent Lewis Realty, Inc.—West, by the acts of its vice-president, secretary, and manager, Marvin A. Zetley, in the Ewens transaction, has engaged in conduct which constitutes improper dealing, contrary to sec. 136.08 (2) (k), Stats."

The portions of conclusions 1 and 2 which refer to representations made by Malawsky are wholly unsupported by the board's findings of fact. Because of this they cannot stand. By the necessary elimination of this element of representations, the conclusions that Malawsky and Lewis Realty, Inc. —West have "demonstrated untrustworthiness" also fall of their own weight.

We have searched the board's findings of fact with respect to the Ewens transaction in vain for any conduct on the part of Zetley that he attempted to take an unfair financial advantage of Mrs. Ewens. Neither did his conduct involve any moral culpability, although he may have been a little over-aggressive in urging Mrs. Ewens to accept the Christensen offer. Therefore, Zetley's conduct did not constitute "improper dealing" within the meaning of sec. 136.08 (2) (k), Stats. For this reason conclusions 3 and 4 are disapproved in their entirety. The only conclusions of law relating to the Ewens transaction which would support the imposition of a disciplinary penalty against Malawsky and

Lewis Realty, Inc.—West are those determining that incompetency was demonstrated. The finding of fact which supports such conclusions is the one which found that Malawsky obtained a signed, blank purchase offer from the Humphreys.

## The Noetzel Transaction.

On Sunday, July 15, 1956, Mr. and Mrs. Walter C. Noetzel inspected a home which had been listed for sale by Lewis Realty, Inc.—West. They then paid to the plaintiff Schlosser, salesman for Lewis Realty, Inc.—West, $100 to apply on the purchase price of $9,900 for the property and he issued to them an earnest-money receipt for the same. Mrs. Noetzel testified that her husband and she at the same time signed a purchase offer in blank. Schlosser denied this and said that he did not then know how the financing could be worked out, and, therefore, did not have the necessary information to draft a purchase offer. He further stated that it was then agreed that the Noetzels should come to the office later and sign an offer of purchase.

On Wednesday, July 18th, a telephone conversation took place between Mrs. Noetzel and Zetley. Mrs. Noetzel testified that in such conversation she asked for the return of the $100 down payment. Zetley denied this and testified that as far as Mrs. Noetzel went in such direction was to express concern over the importance of the deal to the Noetzels. There is no dispute, however, that before this telephone conversation ended it was understood that a Mr. Schilffarth, Mr. Noetzel's employer, would inspect the property to see whether Schilffarth would loan some money to the Noetzels to help finance the purchase.

Schilffarth did inspect the property around July 30th, and expressed a willingness to loan the Noetzels $1,500 to $2,000. Schlosser later tried to get in touch with Schilffarth but could not. Sometime in August, Schlosser talked to Mrs.

Noetzel and found out that the Noetzels were not going through with the deal. He testified that in such conversation Mrs. Noetzel did not request the return of the $100. Mrs. Noetzel testified that she believes Schlosser did phone later and ask if the Noetzels would be interested in applying the $100 on the purchase of a different property.

On August 21, 1956, Mr. Noetzel went to the board and complained about Lewis Realty, Inc.—West not refunding the $100 earnest money. On August 29, 1956, a trust-account check was issued to the Noetzels for the $100 which was mailed to them and they cashed it August 31, 1956.

Zetley testified that he was aware that Schlosser was trying to interest the Noetzels in purchasing a different property and did not know that they desired the return of the $100 until a representative of the board called about it, which was sometime after August 21st. Zetley then promised the board representative the $100 would be promptly returned and had Schlosser phone Mrs. Noetzel to such effect, which Schlosser did. At all times before the return of the $100 it was on deposit in the trust account of Lewis Realty, Inc.—West.

The board's findings of fact made with respect to the Noetzel transaction read as follows:

"That on or about July 15, 1956, the respondent Lewis Realty, Inc.—West, had listed for sale the property of James H. Cuturia at 1528 West Ring street, Milwaukee, Wisconsin;

"That on July 15, 1956, Walter C. Noetzel and Eileen Noetzel were shown the Cuturia property by a salesman for the respondent Lewis Realty, Inc.—West; that Noetzels then went to the office of said respondents and made an offer of $9,900 for said premises to respondent Neal A. Schlosser, salesman for the respondent Lewis Realty, Inc.—West;

"That at the time of making said offer, the respondent Neal A. Schlosser presented the Noetzels with a blank purchase offer for them to sign, which they did;

"That the Noetzels were never presented with a completed copy of this purchase offer;

"That on or about July 18, 1956, the Noetzels first made demand of the respondent Zetley for the return of their down payment, but that said down payment was not returned to them until some time after August 29, 1956;

"That in the Noetzel transaction, the respondent Marvin A. Zetley was acting in his capacity as vice-president, secretary, and manager of the respondent Lewis Realty, Inc.—West."

The finding that is particularly disturbing to this court is the following:

"That on or about July 18, 1956, the Noetzels first made demand of the respondent Zetley for the return of their down payment, but that said down payment was not returned to them until some time after August 29, 1956."

The reason such finding disturbs this court is that it is most unfair to imply that a continuing demand on the return of the deposit existed from July 18th to August 29th when such was not the case. Such finding is wholly at variance with the type of impartial fact finding that the court would expect from an administrative agency acting in a quasi-judicial capacity.

Accepting as true Mrs. Noetzel's version of the July 18th telephone conversation with Zetley, before such conversation concluded it was agreed that Schilffarth was to inspect the property for the purpose of determining whether he would loan money to the Noetzels to enable them to finance the purchase of the property for which the $100 had been paid as a down payment. It was therefore either expressly or impliedly agreed that the $100 would be retained by Lewis Realty, Inc.—West until Schilffarth had made such inspection. This was not done until July 30th and it was sometime in August before Mrs. Noetzel informed Schlosser that the Noetzels had decided against the purchase.

When Schlosser received such information it then became the duty of Lewis Realty, Inc.—West with or without a request from the Noetzels, to have returned the $100 and not to have hung onto it hoping to induce the Noetzels to apply it toward the purchase of another property.

The board's conclusions of law applicable to the Noetzel transaction provide as follows:

"5. That the respondent Neal A. Schlosser, by his actions in securing a blank purchase offer from Walter and Eileen Noetzel, and in neglecting to furnish them with a copy of the completed purchase offer, has demonstrated incompetency to act as a salesman in such a manner as to safeguard the interests of the public, contrary to sec. 136.08 (2) (i), Stats.;

"6. That the respondent, Lewis Realty, Inc.—West, through the acts of its agent Neal A. Schlosser has demonstrated incompetency to act as a broker in such a manner as to safeguard the interests of the public, contrary to sec. 136.08 (2) (i), Stats.;

"7. That the respondent Marvin A. Zetley, in unnecessarily withholding the down payment in the Noetzel transaction, has failed, within a reasonable time, to account for or remit moneys coming into his possession which belong to another person, contrary to sec. 136.08 (2) (h), Stats.;

"8. That the respondent Marvin A. Zetley in his handling of the Noetzel transaction has engaged in conduct which constitutes improper dealing, contrary to sec. 136.08 (2) (k), Stats.;

"9. That the respondent Lewis Realty, Inc.—West, by the acts of Marvin A. Zetley, its vice-president, secretary, and manager, has failed, in the Noetzel transaction, to account for or remit, within a reasonable time, moneys coming into its possession, which belong to another person, contrary to sec. 136.08 (2) (h), Stats.; and has engaged in conduct which constitutes improper dealing, contrary to sec. 136.08 (2) (k), Stats."

Conclusions 8 and 9 are disapproved in their entirety. Taking the most unfavorable view of Zetley's conduct, he

held onto the $100 deposit, after the Noetzels finally decided they did not want the $9,900 property, in the hope of inducing them to purchase another property listed by his corporation. This constituted a violation of sec. 136.08 (2) (h), Stats., but it did not constitute conduct akin to dishonest or fraudulent dealing necessary to qualify it as "improper dealing."

The Cychosz Transaction.

On June 29, 1956, Louis Cychosz entered into a listing contract with Lewis Realty, Inc., for the sale of Cychosz's property. Donald Kaminski represented Lewis Realty, Inc., in the securing of such listing contract. At Cychosz's request a special clause was written into the contract giving him the right to cancel the same on forty-eight hours' notice. About July 13, 1956, Cychosz called Kaminski by phone and informed him he was giving the forty-eight hours' notice to cancel. The reason then advanced by Cychosz for so doing was that Lewis Realty, Inc., had not sufficiently advertised the property and but one prospect had come to view it. Kaminski informed Zetley of such cancellation but, because Zetley was then in conference with another party, when told this by Kaminski, he did not thereafter retain any recollection of it.

Thereafter, Cychosz listed the property with another broker who advertised the Cychosz property in a newspaper. Zetley saw such advertisement and phoned Cychosz and protested Cychosz's listing of the property with another broker when, as claimed by Zetley, Lewis Realty, Inc., had an exclusive listing contract covering such property. Cychosz testified that Zetley then stated, "You see your lawyer, we are going to have a lawsuit." Zetley testified to a somewhat different version of such conversation but the board acted within its discretionary powers in believing Cychosz's testimony.

This conversation took place on or about August 8, 1956. A day or two later Cychosz consulted Miss Irene Gyzinski, an attorney. Kaminski had overheard part of Zetley's telephone conversation with Cychosz, and Kaminski had then told Zetley that Cychosz had previously canceled his listing with Lewis Realty, Inc. Therefore, when Miss Gyzinski telephoned Zetley about the matter, he assured her that such listing had been canceled by Cychosz. She requested a memorandum to such effect. On August 15, 1956, Zetley in behalf of Lewis Realty, Inc., wrote Miss Gyzinski as follows:

"This is to [confirm] our telephone conversation of a few days ago, whereby Lewis Realty, Inc., agreed to cancel listing on property known as 3058 South 29th street. Milw., Wisconsin."

At the hearing Cychosz testified that he had paid Miss Gyzinski an attorney fee of $25 and Lewis Realty, Inc., agreed to reimburse him for such expenditure.

The board entered the following findings of fact with respect to the Cychosz transaction:

"That on June 29, 1956, a Louis Cychosz listed his property at 3058 South 29th street, Milwaukee, Wisconsin, for sale with respondent Lewis Realty, Inc., and that said listing contract provided that Cychosz could cancel same on forty-eight hours' notice to respondent Lewis Realty, Inc.

"That on approximately July 13, 1956, said Cychosz advised respondent Lewis Realty, Inc., that he was giving the forty-eight hours' notice of cancellation of his listing, according to the terms of his contract;

"That thereafter he listed said property for sale with another broker, and when their ad appeared in the paper, he was called by respondent Zetley, who advised him that he was starting a suit for specific performance of his contract;

"That as a result he canceled his listing with the other broker and was obliged to retain an attorney to compel the return of his listing contract;

"That in the Cychosz transaction the respondent Zetley was acting in his capacity as vice-president, secretary, and manager of the respondent Lewis Realty, Inc."

With the exception that there is no testimony as to what type of lawsuit Zetley threatened to institute against Cychosz, we find that there is support in the evidence for the foregoing findings.

The pertinent conclusions of law grounded by the board upon such findings of fact are as follows:

"11. That the respondent, Marvin A. Zetley, has engaged in conduct in the Cychosz transaction which constitutes improper dealing, contrary to sec. 136.08 (2) (k), Stats.

"12. That the respondent Lewis Realty, Inc., by the acts of Marvin A. Zetley, its vice-president, secretary, and manager, has engaged in conduct in the Cychosz transaction which constitutes improper dealing, contrary to sec. 136.08 (2) (k), Stats."

It is obvious that Zetley's conduct described in the findings of fact did not constitute "improper dealing" within the meaning of such term as employed in sec. 136.08 (2) (k), Stats. Therefore, the conclusions of law finding that it did cannot stand.

## The Kremer Transaction.

On July 23, 1956, Lewis Realty, Inc., purchased a residence property for its own account from one Wagner and granted him the right to remain in the property until September 21, 1956. Its salesman Kaminski interested one Joseph G. Kremer in the purchase of such property. On July 18, 1956, Kaminski took a signed purchase offer from Mr. and Mrs. Kremer whereby they agreed to purchase the property for $13,900. Five hundred dollars were paid as earnest money, and an additional $2,500 was to be paid at time of closing, and the balance was to be paid in the form of a mortgage. Kremer insisted that September 1st be stated as the date of taking occupancy because he had received notice from his landlord to be out of his rented apartment by that date. However, Kremer in his testimony verified the fact that Kaminski told him he did not know whether the

offer would be accepted by Lewis Realty, Inc. Kremer told Kaminski he thought he could procure his own financing for the needed mortgage.

When Kaminski submitted the offer to Zetley, the latter told Kaminski the September 1st occupancy date was not satisfactory. Kaminski then telephoned Kremer and asked him to come to the Lewis Realty, Inc., office for a conference with Zetley. Kremer said he was leaving for his vacation but would come to the office after his return on July 29th.

On July 31, 1956, Kremer came to the office and met with Zetley and Kaminski. Kremer said he had been unable to secure the necessary financing. A new purchase offer was then drafted and signed by Kremer. The only two material changes in this new offer from the original one of July 18th was that the additional cash payment to be made at time of closing was increased from $2,500 to $3,000, thus reducing the amount of the mortgage to be given by $500, and the occupancy date was changed from September 1st to September 15th. Zetley had talked to Wagner and had received assurance the latter would be out of the property by September 15th. Kaminski and Zetley testified that this change-of-occupancy date was discussed with Kremer at the conference of July 31st while Kremer denied that this was so. Kremer testified that he was so "keyed up" over the Milwaukee Braves having lost a baseball game that he did not read the new offer which he signed. Kremer further claimed he did not realize that the new offer provided for a September 15th occupancy date until it was mentioned at the time of closing the deal at the building and loan association office on August 22d. Lewis was present at the closing and assured Kremer that Lewis Realty, Inc., would do its best to get him into the property before September 15th.

Wagner vacated September 8th, Kremer obtained occupancy on September 9th, and Kremer moved in on September 10th. Kremer had to pay his landlord an additional

$33 of rent to cover the period from September 1st to September 10th. Lewis Realty, Inc., had prior to the hearing paid him $20 to cover eight days of rent at $2.50 per day, and at the hearing agreed to pay Kremer the additional $13 he had expended for rent.

The board entered the following findings of fact with respect to the Kremer transaction:

"That on or about July 21, 1956, Mr. Joseph G. Kremer, relying on the representation of the respondent Donald Kaminski, a salesman for respondent Lewis Realty, Inc., that Kremer could have immediate occupancy on closing the deal, made an offer to purchase the property at 1506 South 94 place, Milwaukee, Wisconsin, which property was owned by respondent Lewis Realty, Inc.;

"That at the date of closing, August 22, 1956, the Kremers were presented with a copy of a purchase offer showing occupancy to be given on September 15, 1956;

"That said contract was signed only by Mr. Kremer, and that upon signing this offer, Mr. Kremer had not been advised by respondent Zetley that the terms of occupancy had been changed."

By omitting all reference to the conference of July 31st and the signing of the second purchase offer on that date, the above findings give a misleading picture. We are at a loss to understand such omission because both signed purchase offers constitute exhibits received in evidence at the hearing.

The first finding of fact, which has reference to the occasion when the first offer to purchase was signed (which offer bears date of July 18, 1956), we do not consider to be supported by substantial evidence in view of the entire record. This is because Kremer was asked the following question and gave the following answer thereto:

"*Q.* He (Kaminski) said that he would take your offer, *but whether the offer would be accepted or not he didn't know?  A. That is correct.*"

The board entered the following conclusions of law grounded upon the afore-quoted findings of fact made with respect to the Kremer transaction:

"13. That the respondent, Donald Kaminski, in the Kremer transaction has not demonstrated untrustworthiness or incompetency to act as a salesman in such a manner as to safeguard the interests of the public, contrary to sec. 136.08 (2) (i), Stats.

"14. That the respondent Marvin A. Zetley has engaged in conduct in the Kremer transaction which constitutes improper dealing, contrary to sec. 136.08 (2) (k), Stats.

"15. That the respondent Lewis Realty, Inc., by the acts of Marvin A. Zetley, its vice-president, secretary, and manager, has engaged in conduct in the Kremer transaction which constitutes improper dealing, contrary to sec. 136.08 (2) (k), Stats."

Conclusions 14 and 15 are disapproved. This is because there was no conduct on Zetley's part in this transaction which constituted "improper dealing" within the meaning of sec. 136.08 (2) (k), Stats.

The Penalties Imposed.

As to the plaintiff Schlosser we deem that the judgment below must be affirmed because the board's order as to him is supported by the board's findings of fact and related conclusion of law. The discipline imposed by the board's order upon him is the suspension of his salesman's license for one month.

Because of our rejection of the board's determination in its conclusions of law that the plaintiff Malawsky was guilty of conduct which constituted improper dealing and demonstrated untrustworthiness, that part of the board's order suspending his salesman's license for four months cannot stand. This is because the found misconduct on his part is exactly the same as that of Schlosser, viz., taking a purchase order from a prospective purchaser signed in blank, and not leaving a copy thereof with such prospective purchaser.

The board's order in imposing a one month's suspension of license as to one offender and a four months' suspension of license as to another for the identical misconduct is so discriminatory as to be capricious within the meaning of sec. 227.20 (1) (e), Stats. A reviewing court in a proper case may modify an administrative agency order as well as affirm or reverse it. Sec. 227.20 (1). The judgment below in so far as it relates to Malawsky will be reversed and remanded with directions to modify the board's order so as to change the period of the suspension of Malawsky's salesman's license from four months to one month.

In our recent opinion in *Sailer v. Wisconsin R. E. Brokers' Board, supra,* we stated that it lay within the discretion of the board as to whether to suspend or revoke an offender's license in the absence of a showing that there had been discrimination in imposing a more-severe penalty on one offender than another for the same offense. In view of the situation which confronts us in the instant case, we conclude that such holding in the *Sailer Case* failed to give due significance to the word *"arbitrary"* appearing in sec. 227.20 (1) (e), Stats. It is our considered conclusion that penalties, which are imposed by administrative agencies that are so harsh as to shock the conscience of the court, constitute *"arbitrary"* action within the meaning of such statute.

The revocation of license in the *Sailer Case* because of a conversion to the broker's own use of money received from a prospective purchaser, which money had originally been deposited in the broker's trust account, did not shock the conscience of this court. However, we have no hesitancy in stating that the revocations of the broker's licenses of Zetley, Lewis Realty, Inc., and Lewis Realty, Inc.—West in the instant case do shock our conscience. It is apparent from the reading of the memorandum decision of the trial court that the conscience of the revered former chief justice of this court, who wrote such decision, was equally shocked by the

revocation of the licenses of the two corporate plaintiffs. He therein characterized such revocations as an "arbitrary exercise of power."

This court is forcibly impressed by the fact that in this case there has been no determination by the board that any of the plaintiffs have been guilty of any fraud, misrepresentation, double-dealing, overreaching, or any culpable or reprehensible act.

After eliminating the board's findings and conclusions of law with respect to Zetley, which we have disapproved and rejected, there remains only his conduct in the Noetzel transaction which would warrant the imposition of discipline as to him. This offense was in not refunding the $100 to the Noetzels until August 29th after Mrs. Noetzel sometime earlier in that month had finally informed Schlosser that the Noetzels were abandoning purchase of the Cuturia property. However, this $100 at all times remained on deposit in the trust account of Lewis Realty, Inc.—West without any intent on Zetley's part to appropriate it or divert it to any unlawful purpose. This offense does not warrant the imposition of any discipline more severe than suspension of Zetley's broker's license for a limited period commensurate with the nature of the offense. The judgment as to Zetley, therefore, will be reversed, with directions to remand the proceedings as to him to the board for the purpose of reconsidering the nature of the discipline to be imposed on him in the light of this opinion.

The Lewis Realty, Inc.—West office was involved in the Ewens and Noetzel transactions and Lewis Realty, Inc., in the Cychosz and Kremer transactions. Because of our rejection of the board's determination that the Lewis Realty, Inc., and its representatives were guilty of improper dealing in the Cychosz and Kremer cases, it necessarily follows that such part of the judgment of the circuit court as reversed

that portion of the board's order revoking the broker's license of Lewis Realty, Inc., must be affirmed. However, the judgment below remanded the proceeding with respect to Lewis Realty, Inc., to the board for further proceedings. We can perceive of no reason for so doing and it is our conclusion that the proceeding against Lewis Realty, Inc., should be dismissed.

We have upheld the board's determination that Lewis Realty, Inc.—West is accountable for the wrongful acts of its salesmen Malawsky and Schlosser in the Ewens and Noetzel transactions in procuring purchase offers signed in blank, of which copies were not furnished to the signing prospective purchasers as required by board rule. We have likewise held such corporation accountable for the offending conduct of its managing officer, Zetley, in failing to return the Noetzel's $100 earnest-money payment within a reasonable time. For reasons hereinbefore set forth, we have determined that the board's revocation of such corporation's broker's license constituted arbitrary action which cannot be sustained. However, suspension of such license for a limited period commensurate with the offenses committed by Malawsky, Schlosser, and Zetley would not be objectionable in that respect. Nevertheless, as pointed out by the memorandum opinion of the trial court, it is not mandatory that the broker's license of a corporate broker be suspended or revoked merely because such discipline is invoked against one of its offending employees or officers.

The broker's license of Lewis Realty, Inc.—West should not be suspended unless the board deems it absolutely necessary to protect the interests of the public. This is because of the hardship such a step is likely to impose upon innocent employees and stockholders. In considering whether to impose discipline against Lewis Realty, Inc.—West, the question which the members of the board should ask themselves

is whether the corporation is likely to permit its salesmen or officers to repeat such offending conduct in the future unless now penalized with a suspension of license.

That part of the judgment of the trial court, which remanded the proceeding against Lewis Realty, Inc.—West to the board for further proceedings not inconsistent with the memorandum decision of the trial court, should be modified by adding thereto words to the effect that such further proceedings shall not be inconsistent with the within opinion of this court.

*By the Court.*—The judgment with respect to the plaintiff Schlosser is affirmed; the judgment with respect to the plaintiff Malawsky is reversed, with directions to modify the board's order so as to reduce the period of the suspension of his real-estate salesman's license from four months to one month; the judgment with respect to the plaintiff Zetley is reversed, with directions to remand to the board for further proceedings not inconsistent with this opinion to determine the period during which his broker's license is to be suspended; the judgment with respect to the plaintiff Lewis Realty, Inc., is amended so as to eliminate therefrom the provision remanding the proceeding against it to the board for further proceedings; and the judgment with respect to the plaintiff Lewis Realty, Inc.—West is modified by adding thereto the words "and not inconsistent with the opinion of the supreme court."

FAIRCHILD, J., took no part.