FORD, Appellant, v. WISCONSIN REAL ESTATE EXAMINING BOARD, Respondent.

*No. 131. Argued September 8, 1970.—Decided October 9, 1970.*
(Also reported in 179 N. W. 2d 786.)

94

For the appellant there was a brief and oral argument by *Theodore W. Harris* and *Adrian P. Schoone*, both of Racine.

For the respondent there was a brief by *Fritschler, Ross, Pellino & Protzmann* and *John C. Fritschler, Jr.*, and *David J. Ross*, all of Madison, and oral argument by *John C. Fritschler, Jr.*

BEILFUSS, J. The parties [2] have formulated and argued three questions:

1. Is a real estate broker guilty of racial discrimination in refusing to show property listed with him to Negroes pursuant to the unsolicited oral instructions of

[2] The Bud Orth Real Estate Agency, although served, did not appear in the action in the circuit court to review the order of the examining board and does not appear on this appeal.

the property owner when such instructions were agreed to by the broker at the time the listing contract was made?

2. Does racial discrimination by a licensed real estate broker constitute "incompetency," "improper dealing," or "untrustworthiness" within the meaning, intent, and purpose of sec. 136.08 (2) (i) and (k), Stats., so as to authorize suspension or revocation of his license by the Wisconsin Real Estate Examining Board?

3. Does the decision of the Wisconsin Real Estate Examining Board that such conduct by a licensed broker is not racial discrimination constitute state action so as to deny Negroes the equal protection of the law guaranteed by art. XIV, sec. 1 of the United States Constitution, and art. I, sec. 1 of the Wisconsin Constitution?

The appellant Ford initially argues that Orth's refusal to show him the property falls squarely within the definition of racial discrimination as set forth in sec. 101.60 (1) (b), Stats., which reads:

" 'Discriminate' and 'discrimination' mean to segregate, separate, exclude or treat any person unequally only because of race, color, religion, national origin or ancestry. It is intended that the factors set forth herein shall be the sole bases for prohibiting discrimination."

Orth's conduct does fall within this broad definition but it was not actionable under that chapter. Sec. 101.60 (1) (a) 1, Stats., states that "housing" within the meaning of that section does not include:

"Any building or structure containing living quarters occupied or intended to be occupied by no more than one family and which is used by or was last used by the owner thereof as a bona fide residence for himself and any members of his family forming his household."

Further, sec. 101.60 (3), Stats., provides in part: "This section shall be administered by the industrial commission [3] through its equal opportunities division.

---

[3] Now Department of Industry, Labor & Human Relations.

. . ." This proceeding is clearly before the real estate examining board under the directives of ch. 136.

Appellant also predicates discrimination by Orth on a federal substantive right established by 42 USCA, p. 193, sec. 1982, which provides:

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

In order to sustain a cause of action under this section one must prove that he has been deprived of the "same right . . . to . . . purchase . . . real . . . property" as is enjoyed by white citizens. He must also show that he has been denied the opportunity to purchase property on the basis of his race. If there has been such a denial then a cause of action arises under sec. 1982. (There may be several legitimate reasons which justify an owner in not selling or renting his property to a particular person whether he is white or black.)

This nondiscriminatory right is conferred by federal law and is not dependent on state law. *Bush v. Kaim* (D. C. Ohio, 1969), 297 Fed. Supp. 151.

Previously, 42 USCA, sec. 1982 was thought to bar only discrimination which was the product of state action and that it did not reach private discriminations. *See Hurd v. Hodge* (1948), 334 U. S. 24, 68 Sup. Ct. 847, 92 L. Ed. 1187. However, in June of 1968, the United States Supreme Court decided the landmark case interpreting sec. 1982, *Jones v. Mayer Co.* (1968), 392 U. S. 409, 88 Sup. Ct. 2186, 20 L. Ed. 2d 1189, which held the statute prohibits private discrimination as well as public.

In *Jones, supra,* the petitioners filed a complaint in Federal District Court alleging that the respondents had refused to sell them a home in a St. Louis county, Missouri community solely because the petitioners were Negroes. Relying in part on sec. 1982, the petitioners sought injunctive and other relief. (Jurisdiction ·was

invoked under 28 USCA, pp. 202, 203, sec. 1343 (4), providing for "damages . . . equitable or other relief under any Act of Congress providing for the protection of civil rights.") The district court dismissed the complaint and the Eighth Circuit Court of Appeals affirmed, concluding that sec. 1982 applied only to state action and did not reach private refusals to sell. The supreme court granted certiorari and the precise issue it considered was whether sec. 1982 barred all racial discrimination or merely that which was the product of state action. The court stated, at page 413:

"We hold that sec. 1982 bars *all* racial discrimination, private as well as public, in the sale or rental of property, and that the statute, thus construed, is a valid exercise of the power of Congress to enforce the Thirteenth Amendment."

The court also considered the relationship between sec. 1982 and the "Fair Housing Act of 1968" (42 USCA, p. 686, sec. 3601 *et seq.*). It found that the acts have independent significance and that the exemptions in the 1968 act are not applicable under the 1866 act (sec. 1982). It stated at pages 416, 417: "Its enactment [Civil Rights Act of 1968] had no effect upon sec. 1982 and no effect upon this litigation, . . ."

The standard established in *Jones, supra,* would appear to be simple. At page 421, the court said:

"So long as a Negro citizen who wants to buy or rent a home can be turned away simply because he is not white, he cannot be said to enjoy 'the *same* right . . . as is enjoyed by white citizens . . . to . . . purchase [and] lease . . . real and personal property.' 42 U. S. C. sec. 1982. (Emphasis added.)"

At the beginning of its opinion the supreme court stated what sec. 1982 does not encompass. At page 413 it said: "It does not refer explicitly to discrimination . . . in the provision of brokerage services." In its brief and oral argument respondent cited this quotation in an

attempt to show that *Jones* is not applicable to the instant facts. It is submitted that respondent has taken this quotation out of context. The footnote [10] to the quoted language, at pages 413, 414, states:

"Contrast sec. 806. In noting that 42 U. S. C. sec. 1982 differs from the Civil Rights Act of 1968 in not dealing explicitly and exhaustively with such matters . . . we intimate no view upon the question whether ancillary services or facilities of this sort might in some situations constitute 'property' as that term is employed in sec. 1982. . . ."

The court was talking about whether brokerage services themselves could be considered property which could unlawfully be withheld in violation of sec. 1982, not that a broker was exempt from sec. 1982 when acting for another person, as respondent seems to argue.

We conclude from the facts before us that the action of the owner in this case, McMahon, would have been unlawful under 42 USCA, sec. 1982. In their briefs the parties assume that such a violation is a tort and this fact is essential to support appellant's theory that the agent is also responsible.

"Broadly speaking, a tort is a civil wrong, other than breach of contract, for which the court will provide a remedy in the form of an action for damages. . . . But even this vague statement is inaccurate in one respect, since one important form of remedy for a tort is an injunction, granted in a court of equity, before any damage occurs, . . . But the availability of all such remedies will depend in the first instance upon the possibility that an action for damages would lie for the wrong thus averted, . . ." Prosser, *Law of Torts* (3d ed. hornbook series), p. 2, sec. 1.

" 'But in all such cases it is solely by virtue of the right to damages that the wrong complained of is to be classed as a tort.' Salmond, Law of Torts, 12th Ed. 1957, 9." Prosser, *supra*, footnote 5, p. 2.

Clearly, 42 USCA, sec. 1982, does create a right and corresponding duty. Although it is couched in declaratory terms, *Jones v. Mayer Co., supra*, specifically held that it

could be enforced by injunction, but reserved the question as to whether an aggrieved party might assert an implied right to compensatory damages. *See* footnote 14 in *Jones,* at pages 414, 415.

The only other significant authority construing sec. 1982 did consider the question of damages. In *Sullivan v. Little Hunting Park* (1969), 396 U. S. 229, 90 Sup. Ct. 400, 24 L. Ed. 2d 386, the court held that the action of a community recreational corporation in refusing to approve the assignment of a membership share from a member to his lessee, a Negro, was an interference with that lessee's right and violated 42 USCA, sec. 1982. It also held that the corporation could not legally expel the white member for advocating the cause of the Negro, and that he had standing to sue for an injunction and monetary damages. In discussing damages under sec. 1982, the court said, at pages 238, 239:

"Finally, as to damages, Congress, by 28 U. S. C. sec. 1343 (4), created federal jurisdiction for 'damages or . . . equitable or other relief under any Act of Congress providing for the protection of civil rights. . . .'
". . .
"The existence of a statutory right implies the existence of all necessary and appropriate remedies. [Citations omitted.] As stated in *Texas & Pacific R. Co. v. Rigsby,* 241 U. S. 33, 39:
" 'A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied. . . .' "

The construction given to federal statutes by federal courts is conclusive on the state courts. *Elmendorf v. Taylor* (1825), 23 U. S. 152, 160, 6 L. Ed. 289; *In re Oconto County State Bank* (1942), 241 Wis. 369, 6 N. W. 2d 353, 7 N. W. 2d 602. "State courts must conform to decisions of the United States supreme court, as they are law on all matters involving a federal question even though they overrule the estab-

lished law of many state courts." *McCartin v. Industrial Comm.* (1946), 248 Wis. 570, 576, 22 N. W. 2d 522. Based upon the holdings that sec. 1982 does create a right and duty between private individuals, and that a violation of that right does give rise to an implied right to compensatory damages, it would appear that a violation of sec. 1982 may be classified as a tort.

As both parties agree, the law of agency does not insulate an agent from liability for his torts, whether done of his own volition or on behalf of his principal. Restatement, 2 *Agency* 2d, p. 105, sec. 343, reads:

"An agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal, except where he is exercising a privilege of the principal, or a privilege held by him for the protection of the principal's interests, or where the principal owes no duty or less than the normal duty of care to the person harmed."

The Restatement rule was cited and approved by this court in *Purtell v. Tehan* (1966), 29 Wis. 2d 631, 639, 139 N. W. 2d 655.

The essential and basic feature underlying the relation of a broker to his employer is that of agency, and the principles of the law of agency apply throughout. 12 Am. Jur. 2d, *Brokers,* p. 795, sec. 30. Respondent is correct in its contention that a broker must act in conformity with his authority and instructions and is responsible to his principal if he violates this duty, but clearly an agent is not liable for failure to obey instructions to perform acts which are illegal. 3 Am. Jur. 2d, *Agency,* p. 585, sec. 206; 3 C. J. S., *Agency,* p. 32, sec. 152; Restatement, 2 *Agency* 2d, p. 264, sec. 411.

Respondent argues that sec. 343 of the Restatement is not applicable here since Orth's conduct did not constitute an "act otherwise a tort" under that section. This is predicated on the fact that he had no right to show or sell the property without the owner's consent which was

admittedly withheld. In effect, Orth says he could not be guilty of a tort for refusing to do something since he could not have done it even if he had wanted to. This argument would be completely valid if Orth had taken the listing without any conditions or agreements and was prevented from showing the property to a Negro because McMahon refused to allow it. But the record here indicates that Orth entered the agency agreement with an oral agreement that he would not show the property to Negroes. Orth agreed to and ultimately did assist his principal in the commission of a tort. Comment *d* to sec. 343 of Restatement, 2 *Agency* 2d, p. 106, states: "An agent who assists another agent or the principal to commit a tort is normally himself liable as a joint tort feasor for the entire damage."

Respondent argues that Orth did not perform any independent or discretionary act leading to its inability to show the property to Ford. But he was offered the listing on the condition that he agree not to show it to Negroes. He was free to accept or reject the offer. He was not ignorant of the implications of the agreement since he testified that such conditions were not written into his records on the advice of his attorney. At that point he independently and voluntarily agreed to assist the owner in a violation of 42 USCA, sec. 1982, if the situation arose, and ultimately did so when Ford requested to see the property.

Respondent also argues that nothing in the record shows that Orth's refusal was racially motivated. Apparently the assumption must be that his agreement to refuse to show it to a Negro was economically motivated, he did not want to lose the listing. But a distinction may be drawn between a discrimination made on the basis of race, *i.e.*, the standard by which it is made regardless of motivation, and a discrimination that is racially motivated, *i.e.*, the reason it is made. *Jones v. Mayer Co., supra,* we believe, is broad enough to hold that whenever a person is denied the right to purchase solely because

he is a Negro a violation of sec. 1982 has occurred, no matter what the underlying motivation might have been.

Concerning the question of motive, consideration might be given to the trend of decisions involving suits under 42 USCA, sec. 1983, civil actions for deprivation of rights under color of state law. Clearly the emphasis there is to read the Civil Rights Act against the background of tort liability which makes a man responsible for the natural consequences of his own actions. It seems inconsistent to say that a man is responsible for the natural consequences of his actions and then require that those actions be improperly motivated. If an essential element of the tort itself is an improper motive, such as in malicious prosecution, then that element must be shown. But its necessity is found in the common law of tort, not in the Civil Rights Act. *See Monroe v. Pape* (1961), 365 U. S. 167, 81 Sup. Ct. 473, 5 L. Ed. 2d 492; *Pierson v. Ray* (1967), 386 U. S. 547, 87 Sup. Ct. 1213, 18 L. Ed. 2d 288; *Whirl v. Kern* (5th Cir. 1968), 407 Fed. 2d 781; *Joseph v. Rowlen* (7th Cir. 1968), 402 Fed. 2d 367.

42 USCA, sec. 1982, is written in declaratory language setting forth the property rights of all citizens. *Jones v. Mayer Co., supra,* held that it bars *all* racial discrimination in the sale or rental of property. A refusal to sell or rent property to a person solely because of his color naturally results in a violation of sec. 1982, and a person making or assisting such a refusal should be responsible for such natural consequences.

While it cannot affect the present controversy, it is significant that the Fair Housing Act of 1968, 42 USCA, sec. 3603 (b) (1), provides that after December 31, 1969, the sale or rental of single dwellings by real estate brokers, agents or salesmen shall be subject to the anti-discrimination provisions of the act. Thus it appears as of the date of this opinion that discrimination because of a person's color or race in the sale or rental of property, including single family dwellings, is unlawful by the owner under 42 USCA, sec. 1982 (1866), and by the

real estate broker, agent or salesman under the Fair Housing Act of 1968, 42 USCA, sec. 3601 *et seq.*

Respondent cites *Vargas v. Hampson* (1962), 57 Cal. 2d 479, 370 Pac. 2d 322. That case may be distinguished. That was an action by plaintiffs of Mexican ancestry against a real estate broker for injunctive relief based upon a California statute prohibiting discrimination in the rendering of services in all business establishments. The court sustained a special demurrer with leave to amend on the grounds that the complaint was uncertain and ambiguous in that it was not clear whether they were complaining of defendant's actions solely as they related to the conduct of his own business or as the agent of third parties. The court said a clarification was necessary because if the action was against him as agent there was no allegation that he had the authority to complete the transaction; and if it was against him in the conduct of his own business, it contained inconsistencies because other facts alleged showed that he had rendered some services.

We now turn to a consideration of whether the Wisconsin Real Estate Examining Board had authority to revoke or suspend the Orth Agency license.

The examining board is not a court but an administrative agency created by the legislature and dependent upon the legislature for its existence and the scope of its activities. It has such authority and only such authority as has been given to it by the legislature or by its own rules adopted pursuant to legislative directive. Ch. 136, Stats., in the main, creates the board and prescribes and circumscribes its powers and duties.

There is no specific statute dealing with real estate brokers or agents forbidding racial discrimination, nor has the board enacted any rule forbidding it. Substitute Amendment 1, A., to Assembly Bill 413 (1965), attempted to create sec. 136.08 (2) (km), Stats., to read:

"Discriminated against any person because of race, color, creed, national origin or ancestry, in selling, leas-

ing, subleasing, renting, showing or financing of real estate."

However, the bill was not passed.

If the board is empowered to take any action its authority must be found in sec. 136.08 (2) (i) or (k), Stats., which reads:

"The commission may also on its own motion, or upon complaint in writing, duly signed and verified by the complainant, and upon not less than 10 days' notice to the broker or salesman, suspend any broker's or salesman's license or registration if it has reason to believe, and may revoke such license or registration as provided hereafter, if it finds that the holder of such license or registration has:

". . .

"(i) Demonstrated untrustworthiness or incompetency to act as a broker, salesman or cemetery salesman in such manner as to safeguard the interests of the public;

". . .

"(k) Been guilty of any other conduct, whether of the same or a different character from that specified herein, which constitutes improper, fraudulent or dishonest dealing."

The purpose of ch. 136, Stats., was discussed by the court in *Hilboldt v. Wisconsin Real Estate Brokers' Board* (1965), 28 Wis. 2d 474, 481, 137 N. W. 2d 482, where it said:

"Ch. 136, Stats., Real Estate Brokers' Board, is a regulatory legislative enactment, under the police power, designed, primarily, to protect the interest of the general public. The history, as set out by the early cases, reveals that prior to the enactment of these regulatory statutes unscrupulous persons dealt in the buying and selling of real estate either for themselves or others in an unethical and fraudulent manner to such an extent that regulation, for the protection of the general public, became necessary.

"The statutes, as they now exist, provide that one cannot act as a real-estate agent, broker, or salesman unless he has a license issued to him by the state through

the Real Estate Brokers' Board. Before a license can be issued the applicant must meet established qualifications as to education, knowledge of real-estate law, and ethical character. The statute further charges the board with the responsibility of suspending or revoking a license when the holder has violated statutory standards."

Sec. 136.08 (2) (k), Stats., was discussed by the court in *Lewis Realty v. Wisconsin Real Estate Brokers' Board* (1959), 6 Wis. 2d 99, 94 N. W. 2d 238, where the plaintiffs argued that the term "improper dealing" was too vague to provide any standard of conduct for brokers and therefore was unconstitutional. In construing the language of the section the court said, at page 108:

"However, it is the duty of this court to so interpret a statute as to uphold its constitutionality if this can be reasonably done without doing violence to the accepted rules of statutory interpretation. We believe that the context in which the word *'improper'* is used in sec. 136.08 (2) (k), Stats., rules out such rather all-inclusive meanings as those set forth in the above-quoted dictionary definition. The material words of such statute are 'other conduct . . . which constitutes improper, fraudulent, or dishonest dealing.' The word 'improper' has a more-comprehensive meaning than either 'fraudulent' or 'dishonest.' Conduct which violates the moral code and takes an unfair financial advantage of another person with whom the actor deals, is a constituent part of both 'fraudulent dealing' and 'dishonest dealing.' In order to save the constitutionality of the statute we consider it necessary that the words 'improper dealing' as used in sec. 136.08 (2) (k) be restricted to conduct which involves moral culpability and which tends to take an unfair financial advantage of the person with whom the actor is dealing. In other words, it must be closely akin to dishonest or fraudulent dealing."

Appellant admits that the construction is clear and conclusive if the word "and" was used in the conjunctive to mean that such improper dealing must be both morally culpable and tend to take unfair financial advantage of the person dealt with. However, he argues that the court

actually intended to use it in the disjunctive so that either morally culpable acts or acts tending to take unfair financial advantage would be improper dealing as used in the statute.

A fair reading of the *Lewis Case, supra*, does not support appellant's argument. The court resorted to the associated words "fraudulent" and "dishonest" to resolve the meaning of "improper," and construed the phrase as a whole. The statement that improper dealing "must be closely akin to dishonest or fraudulent dealing" leads to the same conclusion. This also was the interpretation placed on that language in 54 Op. Atty. Gen. (1965), 31, 33, where it was stated: "In the *Lewis* case the court restricted the meaning of improper dealing to the taking of unfair financial advantage of the other party, . . ."

*Sailer v. Wisconsin Real Estate Brokers' Board* (1958), 5 Wis. 2d 344, 92 N. W. 2d 841, held that a violation of a board rule may constitute "incompetency" under sec. 136.08 (2) (i), Stats. Except for *Sailer*, "untrustworthiness" and "incompetency" have not been defined within the meaning of that section. Trustworthiness and competency have been defined as they relate to the requirements for granting a license, and a review of those cases indicates that a broker must be trustworthy in a financial sense, and competent as defined in sec. 136.05 (2). *State ex rel. Progreso Development Co. v. Brokers Board* (1930), 202 Wis. 155, 231 N. W. 628; *State ex rel. Durham Corp. v. Brokers Board* (1927), 192 Wis. 396, 211 N. W. 292.

As an administrative agency of the state the board has only those powers which may be found to have been expressly granted, or must necessarily be implied within the four corners of the statutes under which it operates. *American Brass Co. v. State Board of Health* (1944), 245 Wis. 440, 15 N. W. 2d 27. The statutes under which the board operates, as well as this court's interpretation of those statutes, indicate that the power of the board under ch. 136, Stats., is to protect the public from dishonesty and incompetency by brokers in their fiduciary

capacity. An extension of its power to discipline for racial discrimination would seem beyond its authority in the absence of enabling legislation. *State v. Grayson* (1958), 5 Wis. 2d 203, 92 N. W. 2d 272; *McKibbin v. Corporation & Securities Comm.* (1963), 369 Mich. 69, 119 N. W. 2d 557; sec. 227.014 (2) (a), Stats. This position was taken by the attorney general in deciding that the board does not have power under existing law to discipline a broker for racial discrimination in the sale of property owned by the broker. 54 Op. Atty. Gen. (1965), 31. The same reasoning seems applicable to the situation where the broker is acting as agent for the owner.

In addition, the fact that the legislature refused to adopt an anti-discrimination rule to apply to real estate brokers, agents or salesmen makes it clear that the legislature did not intend to give such authority to the examining board.[4]

We conclude that the examining board was without authority to revoke or suspend the real estate broker's license of the Orth Agency because of discrimination.

The appellant contends the failure of the examining board to revoke or suspend the license of Orth for racial discrimination constitutes state action within art. XIV, sec. 1 of the United States Constitution, and art. I, sec. 1 of the Wisconsin Constitution.

Since it appears that the board presently does not have the authority to discipline a broker for racial discrimination, the question here would be whether the failure of the legislature to give it that power constitutes state action.

As both parties point out, there is language in *Reitman v. Mulkey* (1967), 387 U. S. 369, 374, 375, 87 Sup. Ct. 1627, 18 L. Ed. 2d 830, to the effect that a state may

---

[4] In view of the decision of the United States Supreme Court in 1968 in *Jones v. Mayer Co., supra,* and the Fair Housing Act of 1968 passed by Congress, the legislature may want to reconsider its position as to discrimination in the sale or rental of property.

maintain a neutral position toward private racial discriminations:

"Second, the court [California Supreme Court] conceded that the State was permitted a neutral position with respect to private racial discriminations and that the State was not bound by the Federal Constitution to forbid them. But, because a significant state involvement in private discriminations could amount to unconstitutional state action, *Burton v. Wilmington Parking Authority*, 365 U. S. 715, the court deemed it necessary to determine whether Proposition 14 invalidly involved the State in racial discriminations in the housing market."

There is no clear test for determining the distinction between neutrality and state action. Later, in *Reitman, supra,* the court said at page 378:

"This Court has never attempted the 'impossible task' of formulating an infallible test for determining whether the State 'in any of its manifestations' has become significantly involved in private discriminations. 'Only by sifting facts and weighing circumstances' on a case-by-case basis can a 'non-obvious involvement of the State in private conduct be attributed its true significance.' *Burton v. Wilmington Parking Authority* . . . ."

The language of the opinion goes on to indicate that the state supreme court is "armed" with knowledge of the facts and circumstances of the questioned activity, and must assess its potential impact in the milieu in which it will operate. In *Reitman, supra,* the supreme court affirmed the decision of the California Supreme Court which held invalid an amendment to that state's constitution popularly known as "Proposition 14."

In his brief appellant lists many of the cases which have found some form of state action involved in discriminatory practices. An examination of those cases shows that all of them involved discriminatory statutes or ordinances, or some positive action by public officials to enforce or encourage private discrimination. Clearly, the concept of what constitutes state action has been

expanded to include many instances which were previously considered purely private. But no cases can be found to support the proposition that action by state licensees constitutes state action absent a showing of affirmative action by the state requiring or permitting such conduct, or of a relationship of such interdependence between the state and its licensees that the licensee's conduct can be said to be that of the state.

Though not clearly expressed, appellant's argument appears to be that the state has put itself in the position where it cannot maintain an attitude of neutrality toward private discrimination by brokers. Since the brokerage business is so involved with the public interest that the state has seen fit to regulate it, the refusal of the state to condemn a business practice is the equivalent of state ratification or approval of that practice.

The only authorities which can be found to support this argument are the concurring opinions of Mr. Justice DOUGLAS in several civil rights cases. *See Garner v. Louisiana* (1961), 368 U. S. 157, 82 Sup. Ct. 248, 7 L. Ed. 2d 207; *Reitman v. Mulkey, supra.* But the majority of the court has not been willing to go this far.

The question of state action was considered by the Michigan Supreme Court in *McKibbin v. Corporation & Securities Comm., supra,* where that court held that the Michigan real estate licensing board was without power to make a rule prohibiting discrimination by brokers. It found that the failure of the state to affirmatively prohibit discrimination by brokers did not constitute state action within the meaning of the fourteenth amendment.

If the examining board had the authority to discipline for discrimination an arbitrary refusal to exercise that power could be said to be state action. But by narrowly defining the scope of the board's authority the state has succeeded in maintaining the neutrality allowed by the supreme court.

Even if the state action argument by the appellant could be accepted it is doubtful that any relief could be

had in this action for the reason that it is simply a review of the activity of an administrative tribunal. If the state has unconstitutionally acted by the failure of the legislature to act, it would seem that the complainant must seek his relief through an action in court, either state or federal.

It is our opinion that the examining board was without authority to revoke or suspend a real estate broker's license because of racial discrimination and that it properly dismissed the appellant's complaint.

*By the Court.*—Judgment affirmed.