Warren DILLON and Jean Dillon, Individually and on behalf of others similarly situated, Plaintiffs-Appellants,

v.

AFBIC DEVELOPMENT CORPORATION, Riley Smith, Inc., and Riley B. Smith, Defendants-Appellees.

No. 76–3797.

United States Court of Appeals, Fifth Circuit.

June 21, 1979.

Rehearing Denied Aug. 9, 1979.

**558**

J. U. Blacksher, Gregory B. Stein, Mobile, Ala., Jack Greenberg, Linda S. Greene, Beth J. Lief, New York City, for plaintiffs-appellants.

Chase R. Laurendine, Alphonse Maples, Jr., Mobile, Ala., for defendants-appellees.

Before WISDOM, COLEMAN and RONEY, Circuit Judges.

WISDOM, Circuit Judge:

This case involves the liability of participants in a subdivision development for a racially motivated refusal to sell a dwelling in violation of the Fair Housing Act of 1968, 42 U.S.C. §§ 3601 *et seq.*, and a provision of the Civil Rights Act of 1866, 42 U.S.C. § 1982. We hold that the district court misconstrued the applicable law when it exonerated three of the four participants. We find that two of these three defendants violated both statutes. Accordingly, we remand this case to the district court for determination of damages and a consideration of the plaintiffs' motion for an award of costs and attorney fees.

## I.

### THE FACTUAL SETTING

The dispute in this case arises from the efforts of the plaintiffs-appellants, Warren Dillon and Jean Dillon, a black couple, to purchase a home located on lot 30 of the Lansdowne subdivision in Mobile, Alabama. To understand their grievance, we must first trace the development of Lansdowne.

Alabama Farm Bureau Insurance Corporation Development Company, Inc. (AFBIC), an Alabama corporation and a defendant-appellee, became interested in purchasing some land in Mobile and developing it into a subdivision. To carry out this project, AFBIC enlisted the assistance of Riley Smith, Inc. (RSI), also an Alabama corporation and a defendant-appellee. Riley B. (Boykin) Smith, the other defendant-appellee, is the son of the founder of RSI and, during the period of this dispute, was its vice-president and sole shareholder. Boykin Smith supervised RSI's efforts on AFBIC's behalf. RSI served as the real estate agent when the original owners of the land sold the area to AFBIC. AFBIC then subdivided the property and appointed RSI as its exclusive agent for the sale of the unimproved lots to professional home builders. Instead of receiving commissions on these sales, RSI obtained exclusive listing rights from the builders. By this series of transactions, RSI was assured a commission on the sale of every completed dwelling. In short, RSI was serving as AFBIC's agent for the sale of the lots to the builders and the builders' agent for the sale of the homes.

The purchase agreements between the home builders and AFBIC varied, depending upon the source of each builder's construction finances. Each builder that was financed by a construction loan paid the purchase price and received title to the lot when it received the loan money. Each builder using its own construction money usually paid a down payment to AFBIC, completed the home, and, through RSI, secured a purchaser before paying AFBIC the remainder of the purchase price. The latter arrangement governed the contract dated May 1, 1972, in which Bay City Construction Company, Inc. (Bay City) agreed to purchase lot 30, the lot involved in this case. That contract specified that Bay City had complete authority to accept or reject offers to purchase the home Bay City would build on the lot. The contract also required AFBIC to convey the lot to Bay City when the

builder presented it with the remainder of the purchase price for the lot.

In the Spring of 1973, the Dillons became interested in the home built by Bay City on lot 30. Some time in April, Jean Dillon went to RSI's office at Lansdowne and asked one of RSI's salesmen, Robert Guillot, to show her the house at 5229 Drexel Drive. This is lot 30. Guillot urged her to make an offer on the house. A few days later, Mr. and Mrs. Dillon went together to see the house. While they were examining it, another RSI salesman, Bryson Hill, informed them that the asking price was $42,500 and asked whether he might show them some floor plans RSI could build for them somewhere else. Hill said that he would get back in touch with them, but he never did.

On May 14, 1973, Jean Dillon went to Lansdowne and asked Guillot to write an offer to purchase the home at 5229 Drexel Drive. Guillot wrote an offer for the full $42,500 asking price and said that $100 would be sufficient for the earnest money. Mrs. Dillon did not have her checkbook with her, but Guillot told her that he would submit the offer anyway and that she could deliver the check at any time.

Guillot took the offer to Boykin Smith. Guillot told Smith that Mrs. Dillon was black and that the home she wanted to purchase was located next door to the home owned by Brewton Greene, the owner of Bay City Construction Company. Smith presented the offer to Greene and informed him that Mrs. Dillon was black. According to Smith, Greene rejected the offer because no earnest money check was attached. Smith observed, however, that Greene was "unhappy" that the offeror was black. Smith then told Guillot that Greene had rejected the offer and, according to Guillot, also told him that Greene "went through the ceiling" as a result of the offer. Guillot then informed Mrs. Dillon that her offer had been rejected.

Guillot apparently put off Mrs. Dillon's efforts to make another offer until she appeared at RSI's Lansdowne office on May 16. At her insistence, he then wrote another offer. Like the first offer, it provided for the full $42,500 asking price and for $100 earnest money. This time, Mrs. Dillon's check for $100 was attached. Because Mr. Dillon was out of town on business, Mrs. Dillon asked Guillot if the offer could be conditioned on her husband's approval by May 24. Guillot informed her that the condition was not a problem. Guillot signed the offer as a seller's agent.

Guillot then took the offer to Smith, who passed it on to Greene. Greene rejected the offer, allegedly because it was conditional and because the $100 earnest money check was insufficient. During his testimony at trial, however, Greene admitted that he refused to sell because the Dillons were black and that he had probably informed Smith of his motive.[1] In addition, Smith testified at the trial that he was aware that Greene's refusals to sell were racially motivated and

---

1. Greene testified as follows:

Q. Did you or did you not communicate to Boykin Smith your unhappiness in the prospect of selling this house to a black person?

A. I am sure I wasn't overly enthused about it for personal reasons; not financial, though.

. . . . .

Q. Do your personal reasons have anything to do with race?

. . . . .

A. Well, at this particular time, and even prior to that, my wife has been an ill person, a nervous person . . . . .

Q. Are you telling the Court that you were concerned that having black people moving next door to your wife might upset her?

A. Yes, sir.

. . . . . .

Q. But you did tell him [Boykin Smith] that you were concerned about the fact that there would be black people living next door to you?

A. I probably told him something to that effect.

Q. Did he tell you that that was an unlawful reason to refuse to accept the offer?

A. He might have told me such; he didn't have to tell me. I am a businessman; I should have known.

. . . . .

Q. So, the problem wasn't the hundred dollar binder that came with the offer, it wasn't financial, as you said?

A. No, sir, it was personal and I think I said that from the beginning.

R. 274–79.

that he himself had been somewhat apprehensive about whether selling the home to the Dillons would have a detrimental effect on sales in Lansdowne.[2]

After Smith had conversed with Greene about the Dillons' May 16 offer, Smith decided to reject the offer in writing. His letter to the Dillons stated that their offer had been rejected because it was conditional. Smith's letter also stated that several other persons were interested in the home. According to Greene's trial testimony, however, there were no other prospects at the time the Dillons' offers were rejected.

On May 18, a Friday, Guillot delivered RSI's rejection letter to Mrs. Dillon. She demanded that he write a new, unconditional offer for the full asking price. She refused to accept return of her $100 earnest money check, so Guillot gave her a receipt for the check and attached it to the new offer. Mrs. Dillon telephoned Guillot several times during the weekend and went to see him at Lansdowne on Sunday, May 20. In each conversation, Guillot told her that he had been unable to contact Greene. In truth, however, Guillot had passed on the offer to Smith on Friday, May 18. Smith informed Greene of the offer that afternoon. Either on Friday or the following Monday, May 21, Greene rejected the offer and told Smith that he was going to sell the home on lot 30 to his son. In any event, on May 21 Smith telephoned Mrs. Dillon and stated that her offer had been rejected because of Greene's decision to sell it to a member of his family.

Throughout this period, AFBIC's involvement was minimal. James Richardson, an AFBIC official located in Montgomery, was responsible for supervising the Lansdowne development. Riley Smith, Boykin's father and the founder of RSI, testified that he had told Richardson that RSI had received an offer from a black couple, meaning the Dillons. Richardson told Riley Smith that he ought to accept the offer. Neither RSI nor Bay City informed AFBIC of Greene's wrongful refusal to sell. At the trial, Richardson testified that he might have objected if he had known of Greene's racially motivated refusal to sell. He also testified, however, that Greene's conduct might not have mattered to him and that AFBIC had never encouraged RSI and Bay City to seek black purchasers.

On May 24, the Dillons filed this action against Bay City, RSI, Boykin Smith, and AFBIC. The plaintiffs asserted causes of action for the wrongful refusal to sell the home under the thirteenth amendment; the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982; and the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq. The plaintiffs sought declaratory and injunctive relief for the class of similarly situated blacks, as well as injunctive relief, compensatory and punitive damages, and costs and attorney fees for themselves. On June 6, 1973, after a hearing on the plaintiffs' motion for a preliminary injunction, the district court ordered Bay City to convey the home on lot 30 to the Dillons for the full asking price. On that date, the district court also dismissed the plaintiffs' claims against RSI, Boykin Smith, and AFBIC. The plaintiffs bought the home,[3] settled with Bay City,

---

2. Under questioning by the district court, Smith testified as follows:

THE COURT: Mr. Smith, Mr. Green [sic] didn't want to sell to a black man, did he?
A. No, sir.
THE COURT: It was next door to him, wasn't it?
A. Yes, sir.
THE COURT: As far as you know, was that a new experience for him?
A. As far as I knew, yes, sir.
THE COURT: In Lansdowne, had any blacks bought in the subdivision?
A. No, sir.

THE COURT: Was this the first experience of a black offering to buy in the subdivision?
A. Yes, sir.
THE COURT: Did you have any knowledge of what that would have done to the sales in the subdivision?
A. We thought it could possibly be detrimental.
THE COURT: So, you were apprehensive about the thing, yourself, weren't you?
A. Somewhat, yes, sir.
R. 215–16.

3. The record reveals that AFBIC transferred title to lot 30 to Bay City on June 19, 1973, and that Bay City conveyed the lot and the home to the plaintiffs ten days later.

and appealed the dismissal as to the other three defendants. This Court reversed and remanded for full discovery and trial. *Dillon v. Bay City Construction Co.*, 5 Cir. 1975, 512 F.2d 801.

On remand, the district court certified the case as a class action on behalf of all blacks who sought or would seek to purchase or rent dwellings through the three defendants. Then, after a bench trial, the district court exonerated the three defendants of any statutory violations. *Dillon v. AFBIC Development Corp.*, 1976, S.D.Ala., 420 F.Supp. 572. The only relief granted by the court was premised on the theory that the members of the class of black purchasers and renters were third-party beneficiaries of a nondiscrimination agreement RSI executed with the Department of Housing and Urban Development and the Veterans Administration. On that basis, the court enjoined RSI and Boykin Smith from failing to take affirmative action to remedy their marketing practices and ordered them to submit periodic reports to the court. The court ruled that each party was to bear its own costs.

## II.

### FEDERAL ANTIDISCRIMINATION STATUTES APPLICABLE TO PROPERTY SALES

The Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.*, provides that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States". 42 U.S.C. § 3601. To carry out that purpose, Congress made it unlawful "to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin". 42 U.S.C. § 3604(a). The Act contains an exemption for the sale of a single-family home by its owner, but that exemption does not apply if the home is sold with

the use in any manner of the sales or rental services of any real estate broker, agent, or salesman, or of such facilities or services of any person in the business of selling or renting buildings, or of any employee or agent of any such broker, agent, salesman, or person.

42 U.S.C. § 3603(b). Thus, Greene's refusal to sell comes within the prohibitions of the Act. The rights protected by the Act may be enforced by a civil action in federal district court. 42 U.S.C. § 3612(a). The district court may grant to a prevailing plaintiff injunctive relief, actual damages, costs, and up to $1,000 in punitive damages. In addition, the court may award reasonable attorney fees to a prevailing plaintiff if the plaintiff is financially unable to assume them. 42 U.S.C. § 3612(c).

A provision of the Civil Rights Act of 1866, 42 U.S.C. § 1982, states:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white persons thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

On June 7, 1968, only about two months after Congress passed the Fair Housing Act, the Supreme Court held "that § 1982 bars *all* racial discrimination, private as well as public, in the sale or rental of property, and that the statute, thus construed, is a valid exercise of the power of Congress to enforce the Thirteenth Amendment". *Jones v. Alfred H. Mayer Co.*, 1968, 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (emphasis in original). The Court rejected the suggestion that the enactment of the Fair Housing Act impliedly repealed or modified § 1982. 392 U.S. at 416 & n.20, 88 S.Ct. 2186. It is clear, then, that the Fair Housing Act and § 1982 stand as independent statutory remedies available to black plaintiffs against persons who refuse to sell them property because of their race. *See generally* Chandler, *Fair Housing Laws: A Critique*, 24 Hastings L.J. 159 (1973); Morris & Powe, *Constitutional and Statutory Rights to Open Housing*, 44 Wash.L.Rev. 1, 56–83 (1968); Smedley, *A Comparative*

*Analysis of Title VIII and Section 1982*, 22 Vand.L.Rev. 459 (1969).

Brewton Greene admitted that he refused to sell the home to the plaintiffs because they were black. That action, of course, violated both the Fair Housing Act and § 1982. Greene's liability is not before us, however, since the plaintiffs have settled their claim against him. On this appeal, the plaintiffs seek to recover actual damages, punitive damages, costs, and attorney fees from RSI, Boykin Smith, and AFBIC. Their liability will be considered in turn.

## III.

## THE LIABILITY OF RSI AND BOYKIN SMITH

■ Boykin Smith's testimony reveals that he knew that Greene's refusals to sell were racially motivated. Smith nonetheless saw to it that Greene's refusals to sell were transmitted to the plaintiffs and made affirmative misrepresentations about Greene's motives.[4] We agree with the plaintiffs that Smith's participation in the refusals to sell renders both RSI and him liable under the Fair Housing Act and § 1982.

■ An action based upon the federal antidiscrimination statutes is essentially an action in tort. As the Supreme Court has written in regard to the Fair Housing Act, "[a] damage action under the statute sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach". *Curtis v. Loether*, 1974, 415 U.S. 189, 195, 94 S.Ct. 1005, 1009, 39 L.Ed.2d 260. The Court noted that an action to redress racial discrimination is analogous to an action for defamation or for intentional infliction of mental distress. 415 U.S. at 195, n.10, 94 S.Ct. 1005. It further noted that

the statutory ban on racial discrimination in housing "could be viewed as an extension of the common-law duty of innkeepers not to refuse temporary lodging to a traveler without justification". *Id.* Civil actions involving private racial discrimination in violation of statute, then, should be treated as tort actions. *See Patterson v. American Tobacco Co.*, 4 Cir. 1976, 535 F.2d 257, 269 n.10, *cert. denied*, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286; *Tillman v. Wheaton-Haven Recreation Ass'n*, 4 Cir. 1975, 517 F.2d 1141, 1143; *Wheatley Heights Neighborhood Coalition v. Jenna Resales Co.*, 1978, E.D.N.Y., 447 F.Supp. 838, 842; *Ford v. Wisconsin Real Estate Examining Board*, 1970, 48 Wis.2d 91, 179 N.W.2d 786, 791–92.

■ An agent has no obligation to carry out his principal's order to do an illegal act. *Restatement (Second) of Agency* § 411 (1958). Indeed, except in certain circumstances not relevant to this case, "[a]n agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal". *Id.* § 343. Furthermore, an agent who assists his principal in committing a tort is himself liable as a joint tortfeasor. *Id.*, Comment d. Boykin Smith knew that Greene's decisions to refuse to sell to the plaintiffs were racially motivated. Yet, Smith's letter to the plaintiffs involving the May 16 offer stated that the offer had been rejected because it was conditional and that several other persons were interested in the home. He knew that both of these statements were false. He made these misrepresentations to assist Greene in committing the racially motivated refusal to sell the home to the plaintiffs. In these circumstances, Smith's own conduct violated the federal antidiscrimination statutes. *Accord, Jeanty v. McKey & Poague, Inc.*, 7 Cir. 1974, 496 F.2d 1119, 1120–

---

4. During an exchange with the plaintiffs' attorney, Smith testified as follows:

Q. Did you understand your responsibility to convey the rejection by Mr. Brewton Green to the Dillons, notwithstanding the fact that you knew Mr. Green was rejecting the offer based on the Dillons were black?

A. It was his house and he didn't want to sell it, and I had to tell them or get my people to tell them that.

R. 218–19.

21; *Sanborn v. Wagner*, 1973, D.Md., 354 F.Supp. 291, 295; *Young v. AAA Realty Co.*, 1972, M.D.N.C., 350 F.Supp. 1382, 1387; *Williamson v. Hampton Management Co.*, 1972, N.D.Ill., 339 F.Supp. 1146, 1149; *Ford v. Wisconsin Real Estate Examining Board*, 179 N.W.2d at 792. It is equally clear that RSI is vicariously liable for the statutory violations of Smith, the company's vice-president and sole shareholder, and Guillot, the company's employee. *United States v. Northside Realty Associates*, 5 Cir. 1973, 474 F.2d 1164, *cert. denied*, 424 U.S. 977, 96 S.Ct. 1483, 47 L.Ed.2d 747; *Restatement (Second) of Agency* § 219(1).

## IV.

### THE LIABILITY OF AFBIC

■ As discussed earlier, on May 1, 1972 AFBIC and Bay City entered into a contract for the sale of lot 30. That contract was in force during the period in which Bay City and RSI committed the discriminatory acts against the plaintiffs.[5] Under the contract, AFBIC was under an absolute duty to convey legal title to lot 30 to Bay City when the builder tendered the remainder of the purchase price. Under Alabama law, this contract vested equitable title in Bay City. *See, e. g., Shirley v. McNeal*, 1962, 274 Ala. 82, 87, 145 So.2d 415, 420. If Bay City

tendered the requisite amount and AFBIC refused to convey, Bay City would have the option of suing for specific performance or damages. *E. g., Greene v. Allen*, 1858, 32 Ala. 215. In these circumstances, AFBIC had no legal authority to control the efforts of Bay City and RSI to market lot 30 and the home Bay City had built upon it. The record reveals that AFBIC made no effort to exercise such control. It would be improper, then, to hold AFBIC responsible for the discriminatory acts against the plaintiffs.[6]

## V.

### DAMAGES, COSTS, AND ATTORNEY FEES

■ On remand, the district court must determine the amount the plaintiffs shall recover in actual damages, and whether they may recover punitive damages, costs, and attorney fees. The plaintiffs have prevailed on their individual claim under both § 1982 and the Fair Housing Act. As we pointed out earlier, § 1982 and the Fair Housing Act are independent statutory schemes. The district court, therefore, should allow the plaintiffs to benefit from the more liberal recovery provisions applicable to § 1982 violations. There is no statutory limit placed upon the amount of puni-

---

**5.** The May 1, 1972 contract provided for payment of the remainder of the purchase price within one year. The discriminatory acts carried out by Bay City and RSI occurred in mid-May, 1973, which was, of course, over one year from the date of the contract. This Court asked the parties to file supplemental briefs on the question whether the contract was enforceable during the period in which the illegal acts occurred. The plaintiffs responded by asserting that the contract was enforceable under Alabama law and that, in any event, the defendants had waived any contrary argument. The defendants filed no supplemental brief.

**6.** The plaintiffs presented two theories under which AFBIC might be held liable for the acts of RSI and Bay City. First, the plaintiffs point to several cases holding that the discriminatory conduct of a real estate sales or rental agent may be imputed to his principal, the owner of the real estate, under the doctrine of *responde-at superior*. *See Marr v. Rife*, 6 Cir. 1974, 503 F.2d 735, 740–42; *United States v. L & H Land Corp.*, 1976, S.D.Fla., 407 F.Supp. 576, 580;

*Zuch v. Hussey*, 1975, E.D.Mich., 394 F.Supp. 1028, 1051–52, *aff'd and remanded*, 6 Cir. 1977, 547 F.2d 1168 (table); *United States v. Reddoch*, 1972, S.D.Ala., Equal Opportunity Housing Rep. (P–H) ⁗ 13,569, at 13,778, *aff'd*, 5 Cir. 1972, 467 F.2d 897. Second, the plaintiffs note that several courts have suggested that real estate owners may be liable for the discriminatory acts of their agents on the theory that the duty to obey the federal antidiscrimination laws is nondelegable. *See Marr*, 503 F.2d at 741; *L & H Land Corp.*, 407 F.Supp. at 580; *Zuch*, 394 F.Supp. at 1051–52.

We need not consider the validity of these theories because neither applies to the facts of this case. Both theories presuppose the existence of a relationship between the owner of both legal and equitable title to the real estate and a sales or rental agent. In this case, in contrast, AFBIC did not possess equitable title, and Bay City and RSI were not acting as its agents.

tive damages recoverable for a § 1982 violation. *Compare* 42 U.S.C. § 3612(c) ($1,000 punitive damages limit under Fair Housing Act). *See Fountila v. Carter*, 9 Cir. 1978, 571 F.2d 487, 494. Section 1982 also has a more generous provision for the recovery of attorney fees. The Fair Housing Act allows the recovery of attorney fees to only prevailing parties financially unable to assume them. 42 U.S.C. § 3612(c). In contrast, the attorney fees provision applicable to violations of § 1982, 42 U.S.C. § 1988, has no such limitation. *Bunn v. Central Realty*, 5 Cir. 1979, 592 F.2d 891; *Hughes v. Repko*, 3 Cir. 1978, 578 F.2d 483, 488. The plaintiffs may seek to recover attorney fees under § 1988 even though this action was filed before Congress passed that statute. *Hutto v. Finney*, 1978, 437 U.S. 678, 694 n.23, 98 S.Ct. 2565, 2576, 57 L.Ed.2d 522; *Morrow v. Dillard*, 5 Cir. 1978, 580 F.2d 1284, 1299–1300. Under § 1988, "a prevailing party should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust". *Morrow*, 580 F.2d at 1300.

The plaintiffs raised several other matters involving the recovery of costs and attorney fees. The district court may, of course, award the plaintiffs their full costs and attorney fees for their successful prosecution of their individual claim, including the costs and fees associated with their appeal of the individual claim that resulted in our first decision in this case, *Dillon v. Bay City Construction Co.*, 5 Cir. 1975, 512 F.2d 801. The plaintiffs may not, however, recover costs and attorney fees arising out of their efforts on behalf of the class they represented. The district court held that RSI had committed no class violations. Upon reviewing the record, we conclude that this finding is not clearly erroneous. The district court did give classwide relief when it enjoined RSI from failing to comply with the HUD/VA fair marketing agreement. Since the court based that relief on the agreement and not on any violations of § 1982 or the Fair Housing Act, the plaintiffs may not proceed under 42 U.S.C. § 1988 or 42 U.S.C. § 3612(c) for recovery of the costs and attorney fees arising out of

obtaining the injunction and appealing the denial of other classwide relief.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED to the district court for further proceedings not inconsistent with this opinion.