605 F.2d 1348
 NORTHSIDE REALTY ASSOCIATES, INC., Ed A. Isakson and Thomas
B. Ray, Defendants-Appellants-Cross-Appellees,
v.
UNITED STATES of America, Plaintiff-Appellee-Cross-Appellant.
 No. 78-1373.
 United States Court of Appeals,
Fifth Circuit.
 Nov. 5, 1979.
Rehearing Denied Dec. 17, 1979.
 
 Harold L. Russell, Frederick G. Boynton, Atlanta, Ga., for defendants-appellants-cross-appellees.
 Myron S. Lehtman, Frank E. Schwelb, Drew S. Days, Asst. Attys. Gen., Susan C. Chaires, Atty., Housing Section, Civ. Rights Div., Dept. of Justice, Washington, D. C., William L. Harper, U. S. Atty., Atlanta, Ga., for plaintiff-appellee-cross-appellant.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before BROWN, Chief Judge, COLEMAN and TJOFLAT, Circuit Judges.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 Making its fourth appearance as Northside IV[1], Northside Realty Associates, Inc. (Northside) and two of its officers appeal from the District Court's order holding Northside and the officers in civil contempt of a District Court injunction prohibiting discriminatory housing practices by Northside, its agents, employees, and brokers. On this appeal, Northside[2] challenges four of eleven incidents found by the District Court to evidence conduct violative of the original injunction. On cross-appeal, the Government raises questions regarding the remedial powers of the District Court in civil contempt proceedings. Having surveyed the parties' arguments, we uphold the order of the District Court in all respects.
 
 The Legal Edifice
 
 2
 Northside, a defendant in the action below, is a Georgia corporation engaged in the sale of real estate. From 1972 through 1975, the period at issue here, Northside maintained about a dozen sales offices located in the Atlanta area and had associated with the firm several hundred sales agents. During this time, Northside sold approximately 10,000 houses, with a sales volume exceeding one hundred million dollars. Of these 10,000 houses, Northside identified only 14 as having been sold to black purchasers.
 
 
 3
 Defendant Ed A. Isakson is president of Northside. Defendant Thomas B. Ray is a vice-president of the corporation and is the real estate broker in charge of the North Springs sales office.
 
 
 4
 On July 10, 1970, the United States brought suit against Northside and its then vice-president Isakson, alleging violations of the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C.A. §§ 3601 Et seq. After a non-jury trial, the District Court ruled in favor of the Government. By its order of December 21, 1971 (the 1971 injunction), the Court issued its order of injunction. The Court enjoined Northside and Isakson from engaging in further discriminatory conduct and ordered them to take certain affirmative steps to prevent future discrimination.[3] Of particular relevance here, Northside, its brokers, officers, and agents were permanently enjoined from:
 
 
 5
 a) making a dwelling unavailable to any person because of race, color, religion, or national origin;
 
 
 6
 b) discriminating against any person in the terms and conditions of purchase of a dwelling, or in the services or facilities connected with such sale or purchase or with real estate brokerage because of race, color, religion or national origin; and
 
 
 7
 c) representing, explicitly or implicitly, to any person because of race, color, religion, or national origin that any dwelling is unavailable for sale or inspection when such dwelling is, in fact, available.
 
 
 8
 Following an appeal and subsequent remand for clarification, United States v. Northside Realty Associates, Inc., 5 Cir., 1973, 474 F.2d 1164 (Northside I ), the District Court's 1971 injunction order was affirmed by this Court. Id., 1974, 501 F.2d 181 (Northside II ). Northside's petition for rehearing and rehearing en banc was denied. Id., 1975, 518 F.2d 884, Cert. denied, 1976, 424 U.S. 977, 96 S.Ct. 1483, 47 L.Ed.2d 747 (Northside III ).
 
 
 9
 On June 9, 1975, the Government moved for an order adjudging Northside to be in civil contempt of the 1971 injunction.[4] To remedy the contempt, the Government sought additional injunctive relief and also monetary damages for nonparty victims of Northside's discrimination.
 
 
 10
 Again, following a bench trial, on September 30, 1977, the District Court found all three defendants to be in civil contempt of the 1971 injunction. On November 30, 1977, the Court issued a new injunction wherein the Court reinstated and expanded the proscribed acts of the 1971 injunction, specified conditions for purging the contempt with monetary penalties and ordered certain affirmative remedial measures, such as requiring black "contact reports" and an employee educational training program.[5] The District Court also ordered defendants to pay the Government's costs of $4,594.13 and attorneys fees of $25,000. In light of a prior order in which the Court had declared that the Government was not authorized to seek monetary relief on behalf of individuals, the Court declined to award compensatory damages for nonparty discriminatees.
 
 
 11
 In its order of September 30, 1977, the District Court made a general finding that Northside and its officers and agents had generally persisted in the discriminatory treatment exhibited prior to the 1971 injunction:
 
 
 12
 While Northside and its brokers have instructed Northside agents in general terms not to discriminate, the court finds evidence of a policy that blacks were not to be shown or sold homes in certain areas where white residents or others might object. The court finds that agents often used tactics intended to discourage black prospects. These tactics included requiring them to perform preliminary acts not required of white persons and included referral to other sections of town and to other real estate agents who dealt primarily with property for sale to blacks.
 
 
 13
 The District Court also made specific findings regarding what amount to eleven separate incidents evidencing discriminatory conduct in violation of the 1971 injunction. Although not all of these incidents are challenged on appeal, we think it appropriate to recite the Court's findings regarding all eleven incidents.[6]Northside's Try At Demolition
 
 
 14
 Of the eleven incidents described by the Court, Northside objects to only four incidents numbered (7), (9), (10), and (11). Even as to these, Northside does not challenge the Court's findings as such, but Northside does object to the Court's relying upon these four incidents as evidence of contumacious conduct on the part of Northside.
 
 
 15
 In the first three incidents, numbers (7), (9), and (10), of the four challenged, the Court found that certain Northside sales agents had engaged in discriminatory conduct in violation of the 1971 injunction.[7] Northside challenges the Court's use of these incidents on the grounds that the District Court could not hold Northside responsible for the discriminatory acts of its "independent contractor" sales persons. Furthermore, Northside argues, even if the sales agents were not independent contractors, Northside should not be deemed responsible for their acts because the doctrine of respondeat superior is inapplicable in this civil contempt case. Challenging the Court's reliance on the fourth incident number (11) Northside contends that the testimony of Roger Mills, a "tester," should have been excluded as obtained in violation of Northside's Fourth Amendment right to be free from unreasonable search and seizure.
 
 
 16
 Without considering the few challenged incidents at all, there is clear and convincing evidence that Northside and the individual defendants engaged in racially discriminatory and therefore contumacious conduct in violation of the District Court injunction.[8]
 
 
 17
 The unchallenged findings of the District Court show that Isakson, Ray, and other Northside officers and brokers have personally violated the anti-discrimination prohibitions of the prior injunction and have also directed their agents to engage in similar practices. For example, in incident number (3), Isakson rebuked a Northside broker Spaulding White and told him to fire two of his agents because they had taken a black client to lunch at a country club with which Northside had closed business ties. Although the agents were not in fact fired, they were "bawled out" by White, who admittedly used racial epithets in doing so. The incident became, as one Northside agent testified, "common knowledge" at Northside.
 
 
 18
 On two different occasions, incidents numbered (2) and (4), defendant Ray, executive vice-president of Northside, instructed Northside sales agents either not to deal with black prospective purchasers or to discourage them from buying homes in certain Atlanta neighborhoods. Similarly, when a Northside agent mentioned a wealthy new black client to another Northside vice-president, Spencer Smith, Smith directed the agent to "just leave him alone." Incident number (5).
 
 
 19
 In another incident, number (8), a Northside vice-president, Bill Lewis, refused to show listings to a black woman, Pauline Newman, unless she first secured her own financing. Instead of arranging to have a sales agent show Mrs. Newman listings, Lewis suggested that the woman check her Sunday paper and drive around the neighborhood to look at houses. Obviously unusual behavior for a real estate company, the treatment afforded Mrs. Newman was found and such finding is not challenged to differ from that afforded white prospects.
 
 
 20
 In addition, the Court found that officers or brokers at Northside sales meetings had made discriminatory remarks indicating that black persons should be treated differently from whites. Incident number (3).
 
 
 21
 The above unchallenged findings, showing blatantly contumacious conduct on the part of Northside's leaders and policy-makers, are clearly the material elements in this action. Such unchallenged findings as those just described, as well as other evidence credited by the District Court, although not specifically detailed in the Court's order, fully support the Court's findings of contempt on the part of the corporation and the individual defendants.[9] The challenged findings, concerning only four of the eleven specific incidents cited by the Court, are but icing on the cake, the nails in the coffin of contempt.[10] Northside has failed to convince us that these challenged findings, if erroneous at all, had a substantial effect on the Court's determinations as to the findings of contempt and as to the remedial measures imposed. Because, however, the Court, in ordering the particular remedies here imposed, might have been influenced by the challenged incidents, we think it appropriate to consider Northside's objections to those events to demonstrate the absence of error.
 
 
 22
 What Of Independent Contractor?
 
 
 23
 We first consider Northside's argument that the District Court could not hold Northside responsible for discriminatory acts committed by Northside sales agents without the involvement of Northside officers or brokers. Having considered all the arguments raised by Northside, we find that in this civil contempt proceeding the Court could properly hold Northside responsible for the discriminatory acts of Northside sales personnel.
 
 
 24
 Despite the arguable "independent contractor" status of Northside's sales people,[11] the District Court found, in its order of September 30, 1977, that Northside in fact exercises a significant degree of control over the activities of the sales agents. For example, the Court found that, Northside retains and exercises the full authority to hire, fire, or discipline its sales people. Northside managers give advice and, as the evidence has shown, may even direct the activities of sales agents.[12] A Northside sales agent must sell exclusively through Northside and cannot close or consummate a real estate transaction unless the Northside broker signs the closing statement. Indeed, Northside even holds the sales persons' real estate licenses. These factual findings are not challenged by Northside. It is only the legal characterization of these factual findings that is at issue. For purposes of the Fair Housing Act, these acts are sufficient to support the District Court's finding of an agency relationship between Northside and its sales people.[13] Given this relationship, the sales agents' acts clearly carried out within the scope of their employment and for the benefit of Northside could properly be imputed to the corporate defendant. Dillon v. AFBIC Development Corp., 5 Cir., 1979, 597 F.2d 556. Northside I, 474 F.2d at 1168; Standard Oil Co. of Texas v. United States, 5 Cir., 1962, 307 F.2d 120; Zuch v. Hussey, E.D.Mich., 1975, 394 F.Supp. 1028, 1051-52.[14]
 
 Other Objections Inspected And Rejected
 
 25
 It was also proper to hold the individual defendants responsible for the discriminatory acts of the Northside sales agents. In light of the evidence adduced at trial and discussed above, the Court's finding that the individual defendants either encouraged or could have prevented the agents' discriminatory conduct is not clearly erroneous.[15] See F.R.Civ.P. 52(a). Given this finding, defendant Isakson and Ray could be held accountable for the discriminatory acts of their agents, whether or not the defendants directed or authorized the particular discriminatory acts that occurred.[16] Marr v. Rife, 6 Cir., 1974, 503 F.2d 735, 740-42. See also United States v. Mitchell, N.D.Ga., 1971, 335 F.Supp. 1004, 1006, Aff'd sub nom., United States v. Bob Lawrence Realty, Inc., 5 Cir., 474 F.2d 115, Cert. denied, 1973, 414 U.S. 826, 94 S.Ct. 131, 38 L.Ed.2d 59.[17]
 
 Testers And The Fourth Amendment
 
 26
 We also reject the defendants' contention that the District Court should have excluded the evidence obtained by "testers," individuals who posed as prospective home buyers in order to investigate possible violations of the Fair Housing Act. In this case, evidence from several testing incidents was introduced at trial. In these instances, the testers were participants in a testing campaign conducted under the auspices of the Atlanta Community Relations Commission (CRC). As testing information was gathered by the testers, it was forwarded by the CRC to the Housing Section of the Department of Justice for possible use in legal actions brought by the Attorney General. Arguing that the Justice Department's involvement in the testing program makes the Fourth Amendment applicable to the testers' activities,[18] defendants contend that the testers' actions constituted unreasonable searches and seizures.
 
 
 27
 Even if we assume that the testers were acting as Government agents, there was no Fourth Amendment violation because Northside had no reasonable expectation of privacy with regard to the areas "searched" and the items "seized" by the testers. See Katz v. United States, 1967, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. The testers did no more than what any member of the home-buying public is invited, and indeed welcomed, to do. The testers parked in the Northside parking lots, entered Northside waiting rooms, and, accompanied by Northside sales agents, went into the agents' offices for consultation. The testers were given agents' business cards, and, at least on one occasion, note paper, maps, and an Atlanta "newcomers' kit." While at the Northside offices, the testers were able to observe the racial and sexual composition of the Northside work force and could see whether Housing & Urban Development fair housing posters were displayed in the public areas. The testers did not enter into any restricted areas of the office, such as an employees' lounge. Nor did they examine or take any confidential or private papers.
 
 
 28
 In other words, the testers behaved exactly as a prospective home buyer visiting a real estate office would be expected to behave.[19] To the extent that Northside has held itself open to the public for just the sorts of visits that transpired here, Northside cannot complain that a privacy interest has been thwarted or embarrassed.[20] As the Supreme Court has stated with reference to criminal cases, "A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant." Lewis v. United States, 385 U.S. at 211, 87 S.Ct. at 427, 17 L.Ed.2d at 316. An analogous principle applies in civil cases. See Marshall v. Barlow's, Inc., 1978, 436 U.S. 307, 315, 98 S.Ct. 1816, 1821, 1822, 56 L.Ed.2d 305, 313 ("What is observable by the public is observable . . . by the Government inspector as well.").
 
 
 29
 A Free Ride For Nonparties On Attorney General's Coattail?
 
 
 30
 We cannot, however, end our discussion by affirming the District Court's order of contempt. We must also consider what remedial measures could, or should, have been awarded by the District Court. It is the Government's contention that the District Court should have awarded compensatory damages to nonparty victims of Northside's discriminatory practices. Conceding that such relief is unavailable in an original § 3613 action brought by the Attorney General,[21] the Government argues that compensatory damages for nonparty discriminatees may nonetheless be awarded in this civil contempt action.
 
 
 31
 The District Court rejected this contention, stating that in a civil contempt action compensatory damages may be awarded only to a party to the proceedings. See Clark v. Boynton, 5 Cir., 1966, 362 F.2d 992, 997-98.
 
 
 32
 While we need not foreclose altogether the possibility of third party compensatory relief in civil contempt cases, we agree with the District Court that compensatory damages for nonparties ought not to be granted here as part of the Government's remedy in a civil contempt proceeding brought by the Attorney General to enforce a § 3613 injunction.
 
 
 33
 In the first place, such a remedy appears to exceed the scope of a contempt proceeding. As courts have frequently stated, the purposes of a civil contempt proceeding are two-fold: to compensate the prevailing party[22] for losses or damages caused by the other's noncompliance and to coerce the derelict party into compliance with the original injunction. McComb v. Jacksonville Paper Co., 1949, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599, 604; United States v. United Mine Workers, 330 U.S. at 304-05, 67 S.Ct. at 701-702, 91 L.Ed. at 918-19; Southern Railway Co. v. Lanham, 5 Cir., 1968, 403 F.2d 119, 124 ("Civil contempt is 'wholly remedial' serves only the purpose of a party litigant, and is intended to coerce compliance with an order of the court or to compensate for losses or damages caused by noncompliance.").
 
 
 34
 An award of legal damages to nonparties goes beyond these purposes. Most obviously, the award would not compensate the complaining party the Government in this case who has already been appropriately compensated through the District Court's award of costs and attorneys' fees.[23] However, "Ordinarily, of course, the civil contempt fine 'must not exceed the actual loss to the complainant caused by respondent's violation of the decree in the main cause plus complainant's reasonable expenses in the proceedings necessitated in presenting the contempt for the judgment of the court.' " Clark v. Boynton, 362 F.2d at 998, Quoting Parker v. United States, 1 Cir., 1946, 153 F.2d 66, 71. Moreover, such an award would have at best a tangential effect in coercing future compliance with the Court's decree. The sort of relief sought by the Government here, monetary damages for individual housing discriminatees, is a purely legal remedy, Curtis v. Loether, 1974, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260, which compensates for past wrongs. The enforcement purpose of a contempt order is much better served by ordering, as was done here, the payment of a daily fine in the event of noncompliance with the Court's order. Cf. United States v. United Mine Workers, 330 U.S. at 304-06, 67 S.Ct. at 701-702, 91 L.Ed. at 918-19 (recognizing the coercive effect of a conditional fine in civil contempt cases).[24]
 
 
 35
 It must also be remembered that "(p)roceedings for civil contempt are between the original parties, and are instituted and tried as a part of the main cause." Gompers v. Bucks Stove & Range Co., 221 U.S. at 444-45, 31 S.Ct. at 499, 55 L.Ed. at 807. Accordingly, we would be reluctant to allow this civil contempt proceeding to be used, as the Government would have us do, to enlarge upon the original injunctive action by bringing in new parties with new issues in what would most likely be a new proceeding.[25] The relief sought by the Government here cannot be characterized as merely an incidental part of the main cause. It is an altogether new and different matter.
 
 
 36
 Even were we confident that third party compensatory relief might be a proper remedy in some civil contempt cases, a number of considerations make us ill-disposed to allow such relief in this case. Without elaboration, we mention several difficult legal questions that come to mind. By allowing the relief requested by the Government, we would in effect transform the civil contempt proceeding into a representative class action, with the Government as the representative party. This would take the action far beyond the scope of an ordinary contempt proceeding and would raise all the "class action problems" such as certification, notice and fair representation that such a proceeding entails. Questions would arise concerning the Government's standing to sue for damages on behalf of third parties and concerning the Court's power to award legal relief to persons not before the Court. Difficult Seventh Amendment issues would also have to be resolved, as well as problems regarding what, if any, limitations period should be applied in considering an individual's damages claim. Additionally, there would be difficult questions concerning the collateral estoppel or res judicata effect to be given to findings made by the Court in the contempt proceeding and in any subsequent proceeding or proceedings that might be had to determine the amount of damages to be awarded an individual discriminatee.[26]
 
 
 37
 Finally, we point out that there is no compelling need for the relief sought by the Government. Congress has authorized a private Title VIII cause of action whereby private parties may obtain injunctive relief, compensatory damages, and attorneys' fees. 42 U.S.C.A. § 3612. In this case, several of the witnesses testified that, at the time of their dealings with Northside, they felt that they had been discriminated against. These individuals appeared to be intelligent people, presumably able to make their own determinations about whether or not to seek legal redress.[27] For those witnesses who may not have been aware of any discrimination at the time, they may yet have a cause of action. See Reeb v. Economic Opportunity Atlanta, Inc., 5 Cir., 1975, 516 F.2d 924 (Title VII case). Since Congress has authorized an adequate remedy for individual victims of housing discrimination, we see no reason to imply another one.
 
 
 38
 We have considered all the arguments on this issue, and we now hold that here the Government may not be awarded compensatory damages for nonparties in a civil contempt action brought to enforce a § 3613 injunction. The problems are substantial. The need is not. Absent express congressional mandate, this Court will not aid the building of such a house of cards.
 
 
 39
 AFFIRMED.
 
 APPENDIX A
 
 40
 It is hereby ordered that the defendants may purge themselves of civil contempt by complying with the following provisions of this order. If the contempt is not purged as herein provided, the defendants, and each of them, individually, shall be fined as follows: Northside Realty Associates, Inc., $2,000 per day; Ed A. Isakson, $500 per day; and Thomas Ray, $200 per day. Furthermore, the individual defendants shall be remanded to the custody of the Attorney General, with said custody to continue until said defendant has fully purged himself of the contempt.
 
 
 41
 Each defendant shall file with the court a statement, under oath, verifying that he has read and fully understands this order and will comply therewith.
 
 
 42
 It is further ordered that the defendants Northside Realty Associates, Inc., Ed A. Isakson, and Thomas Ray, all the corporate defendant's officers, employees, brokers, agents, and all persons in active concert or participation with any of them, are enjoined from:
 
 
 43
 (a) Failing or refusing to negotiate for the sale of any dwelling and from making any dwelling unavailable to any person because of race, color, religion, or national origin;
 
 
 44
 (b) Discriminating against any person in the terms, conditions, or privileges of purchase of a dwelling, or in the services or facilities connected with such sale or purchase, or with real estate brokerage, because of race, color, religion, or national origin;
 
 
 45
 (c) Representing, explicitly or implicitly, to any person because of race, color, religion, or national origin that any dwelling is unavailable for sale or inspection when such dwelling is, in fact, available;
 
 
 46
 (d) Failing or refusing to cooperate with any broker, or any representative of any corporate or individual broker, with respect to the sale or negotiation for sale of any dwelling because of the race, color, religion, or national origin of the broker, the salesperson, or the client on whose behalf such available dwellings are being sought, or because of racial occupancy patterns in any place or area;
 
 
 47
 (e) Making, printing, or publishing, or causing to be made, printed, or published, any oral or written notice, statement, or advertisement with respect to the sale or rental of a dwelling which indicates any discrimination, limitation, or preference based on race, color, religion, or national origin, or an intention to make any such discrimination, limitation, or preference;
 
 
 48
 (f) Coercing, intimidating, threatening, or interfering with any person
 
 
 49
 (1) in the exercise or enjoyment of, or on account of his having exercised or enjoyed, any right secured by the Fair Housing Act of 1968, 42 U.S.C. § 3601 Et seq ;
 
 
 50
 (2) on account of his having aided or encouraged any other person in the exercise or enjoyment of any such right.
 
 
 51
 It is further ordered that the defendants shall, within 60 days of the date of this order, submit to the Housing Section of the Civil Rights Division of the Department of Justice of the United States a program for educational training of all employees of Northside Realty Associates, Inc., including, but not limited to, all sales personnel and other real estate agents. The purpose of such a program would be to train them in regard to their responsibilities under this decree as well as the fair housing laws of the United States. While the court does not direct that the employees of the Department of Justice be utilized in the training program, it is suggested that they participate in the program. In any event, it is ordered that the program and its contents must be approved by the Chief of the Housing Section of the Civil Rights Division of the Department of Justice.
 
 
 52
 It is further ordered, adjudged, and decreed that the defendant Northside Realty Associates, Inc. shall require all of its sales personnel to submit a contact report in regard to all black persons or persons whose race is not known with whom they have contact. Said report shall include the name, address, and phone number if known, of the contact, the date or dates of the contact, the nature of any inquiry by the contact, and any and all action taken by Northside Realty Associates, Inc. and/or its agents or employees in regard to that contact. These reports shall be submitted for a period of two years from the date of this order unless sooner terminated by the court. These contact reports shall be maintained for a period of three years from this date and may be subject to inspection by representatives of the Department of Justice at any time during reasonable business hours.
 
 
 53
 For a two year period following the date of this order, any and all salespersons, agents, or other employees whose services are engaged after the training session hereinabove required shall receive a full briefing as to their responsibilities under this order and the Fair Housing Act, said briefing to be given within three days of their employment. Each and every employee, broker, sales agent, salesperson, or other employee who has been instructed pursuant to the provisions of this order shall be asked to sign a statement indicating that he or she has been briefed concerning the Fair Housing Act and has read and understands the terms of this order, and that he or she will comply with the law and the court decree. In the event any employee, broker, or sales agent shall decline to sign such a statement, the defendant shall immediately report that fact to the Chief of the Housing Section of the Civil Rights Division of the Department of Justice, including in the report any reason or statement of said person as to why the statement would not be signed.
 
 
 54
 The defendant Northside Realty Associates, Inc. shall hereafter prominently display in the public area of each of its offices a fair housing poster in a form approved by the Secretary of Housing and Urban Development. Said poster shall be readily visible to any and all real estate prospects entering the office. The defendant shall comply with the provisions of this paragraph for three years from this date.
 
 
 55
 It is further ordered that for a period of three years from the date of this order the defendant Northside Realty Associates, Inc. shall include in all advertising, whether newspaper, magazine, home buyer guide, or any other media, a prominently placed and easily legible statement indicating that dwellings sold through said defendant are available without regard to race, color, religion, or national origin. The provisions of this paragraph may be satisfied by use of the "equal housing opportunity" slogan and/or logo contained in the advertising guidelines for fair housing as promulgated by the United States Department of Housing and Urban Development at 37 Fed. Reg. 6700.
 
 
 56
 Within 15 days of the date of this order, the defendant Northside Realty Associates, Inc. shall, by letter signed by the two individual defendants, notify the Empire Real Estate Board, and every known member of that organization, that it will cooperate with them in the sale of real estate under the same terms and conditions that Northside Realty Associates, Inc. cooperates with other real estate brokers in the metropolitan Atlanta area. A copy of this correspondence shall be submitted to the Chief of the Housing Section of the Civil Rights Division of the Department of Justice.
 
 
 57
 The court has reviewed and considered the plaintiff's cost bill and the defendants' objections thereto. It is hereby ordered that the United States shall recover of the defendants its costs, including reasonable attorney's fees. Costs excluding attorney's fees are hereby taxed in the amount of $4,594.13. Giving due consideration to the provisions of Johnson v. Railway Express Agency, Inc., (sic: Johnson v. Georgia Highway Express, Inc.), 488 F.2d 714 (5th Cir. 1974), and the standards therein determined, the court hereby orders that the United States recover of the defendants the sum of $25,000 attorney's fees.
 
 
 
 [1]
 See Infra at p. 1351
 
 
 [2]
 Unless the context indicates otherwise, the term "Northside" refers to the defendants collectively
 
 
 [3]
 The 1971 injunction is reprinted in United States v. Northside Realty Associates, Inc., 5 Cir., 1973, 474 F.2d 1164, 1166 n. 3
 
 
 [4]
 The Government subsequently amended its complaint to allege that defendants Isakson and Ray were also in violation of the injunction
 
 
 [5]
 This order is reproduced as Appendix A
 
 
 [6]
 (1) The court specifically finds that in late 1972 Joe Profit, an all-American college football player, moved to Atlanta to play for the Falcons and contacted Northside. After some delay, he was referred to Harold A. Dawson Realty Company, which is a real estate firm engaged in the sale of property primarily to blacks and doing business primarily on the south side of Atlanta
 (2) In early 1973 Profit was contacted by a Northside agent, and arrangements were made that he should be shown homes in north Atlanta in a price range commensurate with his very substantial income. Defendant Ray advised an agent not to contact Profit or to make an excuse. Defendant Ray related an incident where a Northside agent sold to a black, creating a bad neighborhood problem. The officers of the corporation specifically discouraged the agents from showing Profit homes in white sections and advised and suggested that they find excuses to avoid selling to him.
 (3) In late 1973 other real estate agents of Northside took a black prospect to lunch at Brookfield West Country Club at their own expense. The utilization of this club, which had a very close tie with Northside, was a normal practice of Northside agents. The president of the company rebuked the broker of the office involved for allowing such an incident to occur, and it was suggested that the agents involved should be fired. The agents were not fired but were severely reprimanded, at which time racial epithets were used by the Northside broker.
 (4) The court further finds that the defendant Ray, after learning that another agent had a black couple as prospective purchasers of a home in a very expensive subdivision handled by Northside, suggested to the agent that these parties, Mr. and Mrs. Harvey Coleman, should be discouraged from buying a home because of Isakson's desire to accommodate the builder's racially discriminatory preferences. This was to be done by speaking derogatorily about the houses. While the agent questioned this practice, the instructions were carried out. (5) Another Northside agent, Ms. Peters, conferred with her broker in regard to showing a home to a reputed wealthy black man. She was advised to leave him alone and not to work with him. (6) Remarks were made at sales meetings which were obviously discriminatory and indicated that black persons should be treated differently from white persons.
 (7) In June of 1973 a black professional employed by a major national corporation contacted a Northside agent in the Sandy Springs office, indicating that he wished to buy a home in north Atlanta near his place of work in that area. He was subsequently discouraged from purchasing a home in that area and referred to a different area on the south side of Atlanta which dealt primarily with black families. (8) In August of 1973 a black woman employed by the Atlanta Community Relations Commission visited the Buckhead office of Northside and spoke with the broker in that office. Even though it would have been the normal practice to have referred such a contact to a sales agent, the broker indicated to the prospect that Northside's main source of financing was limited and suggested that she obtain her own source of financing. This is not the normal manner in which a white prospect would be treated but was a tactic used to discourage blacks. (9) During the summer of 1974 Mike Lewis, a black football player for the Atlanta Falcons, was in the market for a home in north Atlanta and was working with a Northside agent, Ms. Fran Peters. Another Northside agent advised Ms. Peters that it would be best not to show Lewis any homes in the Saddle Creek subdivision because that was one of Mr. Howard Chatham's "babies" and he did not wish anyone selling to blacks.
 (10) In early 1975 Ms. Diane Gower, an agent of Northside, wished to entertain certain former customers for lunch at Brookfield West Country Club as she often did Northside customers. She was told she should not do so because the club had objected to blacks eating there. (11) In June 1975 a white attorney who is married to a black school teacher visited the Buckhead office of Northside. The broker in that office referred them to another company for the purpose of determining by computer what their family could afford. When the couple requested that they be given information as to available houses, that broker only furnished a newspaper and suggested they should refer to it for what was available. The broker did not offer to show any homes to these prospects. White testers who went to the same office a few days later were treated very differently.
 (Bracketed numbers added for ease of reference.)
 
 
 [7]
 Although in describing incident number (10) the District Court did not specify that it was a sales agent that had discouraged Diane Gower from taking a black female client to lunch, the testimony relating to the incident indicates that it was a sales agent indeed the same agent who had warned Fran Peters about Howard Chatham's "babies" in incident number (9). Howard Chatham is the sole shareholder of Northside
 
 
 [8]
 Civil contempt proceedings are reviewed under the clear and convincing standard. United States v. Rizzo, 5 Cir., 1976, 539 F.2d 458, 465; NLRB v. Tupelo Garment Company, 5 Cir., 1941, 122 F.2d 603, 606
 
 
 [9]
 The acts of the Northside officers, done within the scope of their employment and for the benefit of their employer, are attributable to the corporate defendant. Northside I, 474 F.2d at 1168. Of course, the acts of Ray and Isakson go not only to corporate liability but to their personal liability as well
 
 
 [10]
 All but one of the challenged incidents involve only sales personnel and not corporate officers. In the remaining incident, number (8), the officer involved, Bill Lewis, had already been found to have violated the 1971 injunction in connection with the incident involving Pauline Newman
 
 
 [11]
 The sales agents are parties to an agreement with Northside that purportedly establishes an independent contractor relationship. The agreement is standard in the real estate trade
 
 
 [12]
 See e.g., the Court's findings (2) and (5)
 
 
 [13]
 We point out that the question of whether such a relationship exists for Fair Housing Act purposes is a question to be determined by reference to federal law. Marr v. Rife, 6 Cir., 1974, 503 F.2d 735, 740-41
 
 
 [14]
 Without having to rule on the applicability of the doctrine in this case, we observe that several courts, including the Court in this case, have indicated that the doctrine of "non-delegable duty" applies in fair housing cases. See e.g., Zuch v. Hussey, 394 F.Supp. at 1051-52; United States v. Real Estate Development Corp., N.D.Miss., 1972, 347 F.Supp. 776, 785. See also Marr v. Rife, 503 F.2d at 741
 
 
 [15]
 We reject as totally meritless defendants' attempt to portray themselves as innocent bystanders incapable of controlling the discriminatory conduct of their sales agents. Such assertions fly in the face of the evidence, such as that showing that Northside officers expressly ordered sales agents to engage in discrimination, e. g., incident number (4). Indeed, the evidence shows that Isakson ordered that two agents be fired for Not discriminating! Incident number (3). To the extent that Isakson and Ray enforce a discriminatory policy, they could presumably have enforced a nondiscriminatory one, instead
 
 
 [16]
 Of course, some of the agents' discriminatory acts were directly authorized by the individual defendants, and these are indisputably attributable to Isakson and Ray
 
 
 [17]
 The fact that this is a civil contempt proceeding and not an original § 3613 action does not affect our resolution of this issue
 
 
 [18]
 Defendants claim that the sole purpose of the CRC testing campaign was to aid the Justice Department in Housing cases. Defendants point to evidence showing, among other things, that the CRC and the Justice Department had worked closely together in several fair housing cases. The Justice Department's Housing Section was the only Government agency to receive the CRC reports. Housing Section attorneys visited CRC offices and numerous collect telephone calls were made from the CRC to the Justice Department. Justice Department officials advised CRC personnel regarding its testing procedures and, according to the contention of defendants, suggested to the CRC parties to be tested
 
 
 [19]
 The fact that the testers were but posing as prospective home buyers is the only feature in this case that distinguishes their actions from those of true prospective purchasers. This element of deceit has no significant effect here. Courts have consistently upheld the otherwise legal use of informants in criminal proceedings, see e. g., Lewis v. United States, 1966, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312, and have also approved the use of testers in housing cases, Grant v. Smith, 5 Cir., 1978, 574 F.2d 252, 254 n. 3. We see no need to reach a different result in this civil contempt proceeding. Of course, the testers' acts must be lawful. See note 20 Infra
 
 
 [20]
 Obviously, the public, and hence the testers, too, do not have full access to Northside's property. For example, had the testers intruded into restricted areas or ransacked Northside's private papers, we would have a different situation altogether
 
 
 [21]
 United States v. Mitchell, 5 Cir., 1978, 580 F.2d 789
 
 
 [22]
 The cases make it clear that the "prevailing" party (or "complainant") to whom compensatory damages may be awarded is the party litigant who won the original injunction. See, E.g., Hutto v. Finney, 1978, 437 U.S. 678, 691, 98 S.Ct. 2565, 2574, 57 L.Ed.2d 522, 534 ("Civil contempt may . . . be punished by a remedial fine, which compensates the party who won the injunction . . . ."); United States v. United Mine Workers, 1947, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884, 918 ("Where compensation is intended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of complainant's actual loss . . . ."); see also Gompers v. Bucks Stove & Range Co., 1911, 221 U.S. 418, 444-45, 31 S.Ct. 492, 499, 55 L.Ed. 797, 807. ("Proceedings for civil contempt are between the original parties, and are instituted and tried as part of the main cause."). Although the Government has cited cases in which equitable relief has been awarded to nonparties (primarily in the context of suits for back pay under the labor laws or Title VII of the Civil Rights Act), the Government has cited No case in which compensatory relief has been actually awarded to a person not a party to the proceedings
 
 
 [23]
 Regardless of whether an award of attorneys' fees to the Government would be appropriate in an original § 3613 proceeding, such an award may be made, in the Trial Court's discretion, in a civil contempt action. United States v. Greyhound Corp., N.D.Ill., 370 F.Supp. 881, 886, Aff'd, 7 Cir., 1974, 508 F.2d 529. A similar principle has been recognized by this Court in NLRB cases. See e. g., NLRB v. Johnson Manufacturing Co. of Lubbock, 5 Cir., 1975, 511 F.2d 153, 158; NLRB v. Schill Steel Products, Inc., 5 Cir., 1973, 480 F.2d 586, 599; NLRB v. Crown Laundry & Dry Cleaners, Inc., 5 Cir., 1971, 437 F.2d 290, 295
 
 
 [24]
 The Government claims that Hutto v. Finney, Supra, supports its contention that an award of compensatory damages to nonparties would serve a coercive purpose. Although there is dicta in Hutto suggesting that an award compensating a prevailing party for losses sustained as a result of a contemnor's disobedience would not constitute retroactive monetary relief for Eleventh Amendment purposes, we do not consider the Supreme Court's remarks to be dispositive of the issue before us that of the Propriety of awarding compensatory relief to Nonparties in a civil contempt proceeding brought to enforce a § 3613 injunction. The relief sought here is not the sort mentioned by the Supreme Court, and the award of damages to Nonparties involves entirely different considerations than does an award to parties
 
 
 [25]
 The Government has given us no indication of how the amount of compensatory awards is to be determined. The record certainly gives little indication of the amounts of damages suffered by those individuals whom the Court found to be victims of Northside's discrimination. Indeed, it is unclear exactly who these victims are. They are apparently the witnesses specifically found by the Court to have been the objects of racial discrimination and also certain Northside sales agents who lost sales as a consequence of Northside's wrongful acts. Presumably a hearing would be required to ascertain the amount of damages suffered by each of these individuals at the hands of Northside
 
 
 [26]
 For example, what effect would a damages award to Mike Lewis have on his pending § 3612 action? See note 27 Infra
 
 
 [27]
 The facts bear out our supposition. For example, one of the discriminatees in this case testified that she chose not to bring a private action because of her job at the CRC. On the other hand, another witness, Mike Lewis, did bring a private action against Northside